Madden, Judge,
delivered the opinion of the court:
The plaintiffs sue for the refund of part of the income taxes which they paid for the years 1951, 1952, and 195S.[1]
It is the plaintiffs’ position that certain amounts, which were reported on their joint income tax returns for those years as income from royalties from patents and treated as ordinary income, were, in fact, received in connection with the sale of a capital asset, i. e., the patents, pursuant to an agreement dated December 19, 1940, and therefore constituted long-term capital gains within the meaning of section 117 (a) of the Internal Revenue Code of 1939. The question before this court is whether or not the agreement of December 19, 1940, or any subsequent transaction, constituted a sale by the patent owners, including Karl Leubsdorf, of all their substantial rights in the patents, to a person from or through whom the persons who made the payments to them in the years in question traced their title.
The plaintiff Karl Leubsdorf and others, hereafter referred to as the “Leubsdorf group”, in 1936 purchased two patents known as the “Kollmann patents” covering methods for manufacturing shoes with a rubber midsole. As the result of this purchase, Karl Leubsdorf acquired an undivided 77/150ths interest in these patents.[2] The Leubsdorf group subsequently assigned the patents in trust to Grune-baum, a member of the group, to act as trustee for the group in granting licenses and in otherwise dealing with the patents. At about the time the Leubsdorf group acquired the Koll-mann patents, the outstanding license of those patents to United States Kubber Products, Inc., became nonexclusive *167 because of that company’s failure to pay tbe minimum amount of royalty.
In 1939, Grunebaum as trustee for tbe Leubsdorf group granted to Pirelli Limited a nonexclusive license “to manufacture and/or sell” footwear under tbe Bollmann patents in the United States until December- 31,-1941, at which time this license expired, no payments having ever been made to the Leubsdorf group thereunder^
The Bollmann patents were pooled with the Bajeh patent by an agreement dated April 17, 1940, under the terms of which Grunebaum as the trustee of the Leubsdorf group granted to Heinz Bollmann, the son of the inventor of the Bollmann patents and the representative of the owners of the Bajeh patent, an exclusive authority to grant licenses under these patents, provided that Grunebaum or his representative gave his written approval. Forty percent of all royalties received under licenses so granted were to be paid to the owners of the Bollmann patents, and the agent designated to transmit the royalties to the parties was the Chase National Bank of the City of New York..
The next transaction involving the Bollmann patents was the agreement of December 19, 1940. ■ That agreement was between the owners of the Bollmann patents (represented by Grunebaum and by Heinz Bollmann) and the owners of the Bajeh patent (represented by Heinz Bollmann), on the one hand, and Eikol, Inc. (represented by Leo Weill), on the other hand. Bollmann represented the owners of both the Bajeh and Bollmann patents pursuant to the April 17, 1940 agreement and a certain power of attorney executed pursuant thereto. By virtue of this power of attorney,-Bollmann had full authority to act on behalf of Grunebaum in the granting of a' license or licenses under the Bollmann patents, and this fact was stated in the December 1940 contract. Leo Weill, a shoe manufacturer in Europe, had started negotiating with Heinz Bollmann in reference to certain patents while he was still in Europe and continued such negotiations after coming to the United States. Weill had organized Bikol as a holding company through which to conduct his business activities. At the time of the Decém- *168 ber 1940 contract, Weill was the sole stockholder and an officer of Rikol.
Weill had wanted to secure exclusive rights under the Roll-mann and Raj eh patents, and the 1940 contract which was finally executed granted to Rikol “an exclusive license (except for the two non-exclusive licenses now outstanding * * *) for the manufacture and sale of shoes * * *” under these patents. The word “use” was omitted from the granting clause of the December 1940 contract, but the evidence shows that such omission was inadvertent and did not signify a purpose to retain for the owners any rights in these patents. The agreement was for a period of 15 years, and Rikol agreed to pay the patent owners a prescribed percentage of the net cash receipts from the sale of footwear manufactured under the patents.
Rikol never manufactured any footwear. It was never intended by Leo Weill that Rikol would actually produce the shoes. The terms of the contract expressly provided in paragraph 10:
Rikol agrees that it will not grant sub-licenses * * * unless it shall first receive the written consent of Roll-mann thereto; except, however, that Rikol shall have the right to grant licenses to any corporations or other enterprises in which Leo Weill shall directly or indirectly control a majority of the stock. * * *
Acting pursuant to this authorization, Leo Weill organized Wellco Shoe Corporation, taking the letters W-e-1-1 from his own name, which company was set up to manufacture shoes under the patents. Weill was the president of and owned a controlling interest in Wellco for several years after the corporation was organized.
On March 19, 1941, Rikol entered into an agreement with Wellco, granting to the latter “an exclusive license for the manufacture and sale” of shoes under the Rollmann patents. This 1941 agreement recited that Rikol had earlier “obtained a license with respect to the use of” the Rollmann patents. The royalty payments were based on the same percentage of net cash receipts as that prescribed in the 1940 agreement which had granted the exclusive license to Rikol, but the 1941 contract made no provision for the transmittal of the *169 royalty payments from Kikol to the persons who had granted the license to Kikol or from Wellco to Kikol. That agreement also provided that it should expire one year later. The 1941 agreement was signed by Harry Schneider as president of Kikol and by Leo Weill as president of Wellco. It can be assumed that this is the same Mr. Schneider who later became a stockholder of Kikol. At this time, however, Weill was apparently still the sole stockholder of Kikol, and also owned a controlling interest in Wellco.
After the 1941 contract was consummated, a factory was constructed by Wellco, and special machinery for the manufacture of the footwear was purchased and installed, but the commencement of World War II with its shortages of rubber soon made it necessary to halt the manufacture of these shoes for the duration of the war, and to manufacture other items not covered by the patents involved in this suit.
The one-year agreement of 1941 between Kikol and Wellco was never extended in writing, apparently because Weill and Heinz Kollmann felt it was unnecessary since Kollmann was or soon became an employee of Wellco. Heinz Kollmann told Mr. Weill: “We don’t have to make a new agreement, since I am entering the company anyhow.” Weill was, for all practical purposes, the alter ego of both Kikol and Wellco at this time, and Kollmann represented the Leubsdorf group and the owners of the Kajeh patent under the authority granted to him by the April 1940 pooling agreement.
Weill seems to have gradually faded out of the picture, and by the time of the trial of this case, he had no interest in either of the two corporations or in the patents. He remained with Kikol until some time around 1943, by which time a Mr. Jaffin and a Mr. Schneider had become stockholders of that corporation. He retained a controlling interest in Wellco until about 1944 or 1945 at which time he sold stock to Heinz Kollmann and to a Mr. Feistmann, retaining only a one-third interest in Wellco which he ultimately disposed of some time in 1947. Some time in 1945, after Weill had severed all connection with Kikol and no longer controlled Wellco, rubber became available and Wellco resumed the manufacture of footwear using the Koll-mann patents. No written instruments were executed at this *170 time, but Heinz Rollmann, who apparently still represented the Leubsdorf gronp by virtue of the agreement of April 17, 1940, was an officer and stockholder of Wellco and was actively engaged in managing the company’s affairs.
From 1945 to 1947 payments of royalties were made-to the owners of the Rollmann and Rajeh patents computed on the basis of three percent of the net cash receipts from the sale of the shoes manufactured under those patents. This three percent figure was the figure contained in both the December 1940 agreement and the March 1941 agreement. In 1947 this figure was changed to two percent under the following circumstances. On May 27, 1947, Heinz Rollmann, who- was then the president of and a stockholder in Wellco and who was acting as the representative of the owners of the Roll-mann and Rajeh patents, addressed a letter to Rikol which purported to reduce from three to two percent the amount of royalties to be paid by Rikol pursuant to the December 19, 1940 agreement in consideration of an extension of that agreement for an additional five years. This modification was agreed to by Otto Feistmann who was acting as representative of Rikol, and who apparently was the same person to whom Weill had earlier sold some of the stock of Wellco, Heinz Rollmann being the other person to whom Weill had sold such stock. It is not known whether Feist-mann owned any stock in Rikol or was merely acting as an agent of Rikol. Heinz Rollmann was acting as the representative of the owners of the Rollmann and Rajeh patents, apparently still under the terms of the April 1940 pooling agreement, although Grunebaum did not join with Roll-mann in extending this agreement. We do not know whether it was contemplated by the parties that Grunebaum must, under the terms of the April 1940 pooling agreement, approve extensions of licenses or only the original granting of licenses, or whether the power of attorney executed pursuant to that agreement had placed sole authority in the hands of Heinz Rollmann. Grunebaum also seems to have faded out of the picture, and the present record does not indicate what became of him.
There is no proof that Rikol ever paid any royalties directly or indirectly to the owners of the Rollmann patents *171 •or'that Wellco ever paid any royalties to Biko'l. As we hare already stated, the percentage established for computation -of royalty payments was the same under both the December 1940 contract and the 1941 agreement. The April 1940 pooling agreement had designated The Chase National Bank of the City of New York as the agent to receive all royalties paid under licenses granted pursuant to that pooling arrangement. The December 1940 contract provided that transmittal of the royalty payments would be handled through New York Hanseatic Corporation; the 1941 contract between Bikol and Wellco contained no provision as to the transmittal of payments. The payments actually received by the plaintiff herein were transmitted by New York Han-seatic, together with notations that such payments came from Wellco.
As we have indicated, the letter of May 27, 1947 purportedly extended the December 1940 contract. ' That contract was also referred to in the 1946 partnership agreement which we will discuss below.
Prior to the purported contract modification, the Leubs-dorf group had organized a partnership known as “Karl & Company” to hold and exploit the Bollmann patents. This partnership agreement recited that “the parties together are the owners of * * * [The Bollmann patents] relating to shoes and the manufacture thereof, together with the right * * * to certain portions of the income from license agreements with Bikol, Inc. and Wellco Shoe Corporation * * [Italics added.] This partnership, late in 1946 or early in 1947, entered into an agreement with Boka, Bo-Search Incorporated and The Bollmanns (a partnership) for'the development of improvements on certain patents and to make know-how and general assistance agreements in the shoe field for the benefit of all the parties to the contract. This contract, which is quoted in our finding 31, stated that the partnership of Karl & Company was the “owner” of the Bollmann patents. This contract was dated retroactively as of May 1,1945, a date prior to the formation of the partnership of Karl & Company.
The next transaction in connection with' the Bollmann patents was an agreement of September 21, 1951, whereby *172 Wellco, Bo-Search Incorporated, and The Bollmanns granted to General Shoe Corporation “an exclusive right and license, except as hereinafter retained by Licensors, to manufacture and sell throughout the United States of America footwear covered by” the Kollmann and Kajeh patents and certain other patents. This licensing agreement in no way affected the operations of Wellco in manufacturing and selling footwear under the Kollmann patents, which operations continued down to the date of the trial of this case without objections from the owners of the Kollmann patents, Rikol or anyone else.
We are of the opinion that the facts of this case, which have been recited at great length, show that the plaintiff Karl Leubsdorf and the other owners of the Kollmann patents did not effectively transfer to any other party or parties all of their substantial rights in these patents so as to constitute a sale of a capital asset thereby making the payments here in issue taxable as long-term capital gains.
It is true that the agreement of December 19, 1940 purported to be an absolute sale of all rights and interests in the Kollmann patents. Leo Weill who was, in fact, Rikol desired to obtain all the rights under the patents which the owners thereof possessed. The evidence shows that the owners intended to sell all their interests in the patents notwithstanding the omission of the word “use” from the granting clause in the 1940 contract. But however absolute the terms of that agreement and whatever the intentions of the parties thereto at that time, the facts show that this agreement subsequently was abandoned or became, at most, a mere licensing arrangement.
Rikol never produced any shoes under the patents; Leo Weill, who was Rikol and who organized Wellco to produce the shoes, gradually dropped out of the picture and left the patents still under the control of the original patent owners. The one-year agreement between Kikol and Wellco was never extended in writing, apparently because the identity of Rikol and Wellco in the person of Leo Weill, plus the fact that Heinz Kollmann, who represented the patent owners through the April 1940 pooling agreement, was coming into Wellco as an employee, made a formal extension of the agreement *173 seem unnecessary to the parties. Wellco actually manufactured shoes under these patents without having any written contract. Heinz Bollmann, who later became president of and a stockholder in Wellco, at the trial testified that he did not know whatever became of Bikol. He did, of course, know and work with Leo Weill at Wellco.
The payments involved in this suit were received by the plaintiff Leubsdorf from Wellco. The plaintiffs contend that Wellco was making those payments on behalf of Bikol. In support of their contention, the plaintiffs can only urge the court to infer that Wellco was acting on behalf of Bikol in making these payments. The record shows that Bikol never made any direct payments pursuant to the 1940 contract, and that Wellco never made any payments to Bikol pursuant to the 1941 contract. The payments were actually transmitted by the agent named in the old 1940 agreement with Bikol, but the transmittal sheets, received by Karl Leubsdorf, stated that the payments came from Wellco. There was never any written provision, even in the one-year agreement of 1941, as to how or to whom Wellco would transmit its payments. These payments from Wellco were not pursuant to any written agreement. If such payments were made on behalf of Bikol pursuant to the 1940 contract, that fact is not proved by the present record. Wellco did not have any title to the patents and made these payments to Karl Leubsdorf as a licensee in a somewhat informal business arrangement.
Whatever the business arrangement was, it was a most informal one. Such informal operations were possible only because Heinz Bollmann who represented the owners of the patents participated in the activities. The plaintiff Leubs-dorf and the other patent owners felt safe to proceed in this informal manner, because their rights were being protected by their representative. They were not concerned with the details of the business; they owned and controlled the patents at all times; they were receiving their royalty payments under various licensing agreements, and they did not care about the informal manner in which the operations were being conducted by these licensees.
*174 Heinz Eollmann addressed the letter of May 27, 1947 to Eikol purporting to extend the 1940 contract, and the 1946 partnership agreement creating-Karl & Company also spoke of the existence of the 1940 contract-with Eikol. There is •no question as to the physical existence of such a document. These references to the existence of such a contract do not, of course, prove its legal effect. ■ The actions of the- original patent owners, acting through Heinz Eollmann, show that they regarded the 1940 agreement as a mere licensing arrangement and not as a sale.- The partnership agreement, referred to above, recites-that the parties thereto are “the owners” of the Eollmann patents and have the rights to certain portions of the “income from license agreements with Eikol, Inc. and Wellco Shoe Corporation * * A later 'agreement with Eoka, Eo-Search Incorporated and The Eoll-manns- contains similar statements. In 1951 there was a licensing agreement with General Shoe Corporation whereby Wellco and others granted “an exclusive right and license” to make and sell footwear covered by certain patents, including the Eollmann patents. This multiplicity of transactions involving these patents subsequent to the purported absolute sale to Eikol, which subsequent transactions were in the name of the original patent owners or their representative or licensee and not in the name’of Eikol, the purported absolute owner of these patents, negative the idea of such an absolute sale; The control which the owners of the Eoll-mann patents continued to exercise over these patents was inconsistent with the existence of an absolute sale to Eikol or to anyone else.
We find that the payments here in question were properly taxable as ordinary income, and the ’ plaintiff s’ petition is therefore dismissed.
It is so ordered.
Laeamoke, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastin G. White, the briefs and arguments of counsel, makes findings of fact as follows:

*175
The Plaintiffs

1. (a) The plaintiffs are, and during the years 1951,1952, and 1953 they were, husband and wife, and citizens and residents of the United States. ■ .
(b) The plaintiff Bertha Leubsdorf is a party to- this case only because she signed joint income tax' returns for. ‘the years 1951, 1952, and 1953 with her husband, the plaintiff Karl Leubsdorf. She did not-take .any of the actions or participate in any of the transactions that are involved -in the litigation.
2. Prior to 1936, Karl Leubsdorf was a citizen and resident of Germany. He was employed by a private banking firm in Cologne from 1933 until early 1936. He immigrated to the United States in 1936, and during that same year he secured employment in New York City with the New York Hanseatic Corporation, dealers in Government bonds, bank stocks, and foreign securities. Mr. Leubsdorf’s employment with the New York Hanseatic Corporation continued until April 1942, when he became associated with Karl H. Pforzheimer & Company in New York City. The-latter is a. brokerage company and a member of- the New York Stock Exchange. This initial association with Karl H. Pforz-heimer & Company continued until 19.43, when Mr. Leubs-dorf obtained a job with a radio'manufacturing-company as a mechanic, after having taken a training -course with thé B.CA -Institute. He continued working for the radio manufacturing company until August 1945. After the end of World War II, Mr. Leubsdorf returned to Karl H. Pforzheimer & Company and became a customer’s - broker with-that company, after passing an examination given by the’New York Stock Exchange. Mr. Leubsdorf was-still associated with Karl H. Pforzheimer ■ & Company in the same capacity at the time of the trial irrthe present case. ■
■ 3. Karl Leubsdorf has never acted as a broker or agent, for others in connection with the sale of patents, or the issuance of licenses under patents,-'or other, disposition of patents or interests in patents; and, except as indicated in the s'ubsequent findings, he has never owned any patents or interests in patents, and has never received any royalties-or *176 proceeds from the licensing, sale, or other disposition of patents or interests in patents.

The Patents

4. (a) Hans Rollmann, who was a manufacturer of shoes and an inventor living in Germany, filed patent application No. 684,295 with the United States Patent Office on August 9, 1933; and he filed patent application No. 717,029 with the Patent Office on March 23, 1934. Patent No. 1,955,720 was issued pursuant to the first of these applications on April 17, 1934; and patent No. 2,168,243 was issued pursuant to the second application on August 1, 1939. These two applications and resulting patents will usually be referred to in these findings as “the Rollmann patents.”
(b) The Rollmann patents covered methods to be used in manufacturing footwear with a rubber midsole. In addition, patent No. 1,955,720 contained two claims covering the products resulting from the use of the methods outlined in the other claims of that patent.
5. On November 9,1934, Hans Rollmann granted to United States Rubber Products, Inc., a Delaware corporation with offices in New York City, a license “to manufacture, use and/or sell footwear embodying and/or utilizing the inventions of” the Rollmann patents. It was provided in the agreement that the royalties should be computed on the basis of the net sales price of the footwear manufactured by the licensee under the patents. It was further provided that the license should be exclusive if the licensee paid to the licensor royalty payments aggregating at least $5,000 for the period ending July 1, 1936, at least $7,500 for the year ending July 1, 1937, at least $10,000 for the year ending July 1, 1938, and at least $15,000 for the year ending July 1, 1939 and-for each subsequent year ending on July 1. In the event of the failure of the licensee to pay the prescribed minimum royalties for any year by the 15th day of July following the expiration of the contract year, the license was to become non-exclusive. The licensee agreed to proceed promptly with the application of the inventions to the commercial production of footwear, and to promote the sale of the footwear manufactured under the patents.
*177 6. (a) Upon learning early in 1936 that United States Rubber Products, Inc., was about to start manufacturing footwear under the Rollmann patents and that the patents were available for purchase, Karl Leubsdorf and six other persons, including Ludwig H. Grunebaum, decided to purchase the Rollmann patents. (This group of seven persons will usually be referred to in these findings as “the Leubs-dorf group.”) Negotiations for the purchase of the Roll-mann patents were conducted by representatives of the Leubsdorf group in Germany, and the T^jjchase was consummated by means of an assignment dated June 17, 1936, which was recorded in the United States Patent Office on August 31,1936. The purchase price was $7,575.
(b) As a result of the transaction referred to in paragraph (a) of this finding, Karl Leubsdorf acquired an undivided 77/150ths interest in the Rollmann patents.
7. For the sake of convenience in dealing with the Roll-mann patents, the Leubsdorf group on November 7, 1936 assigned the patents in trust to Ludwig H. Grunebaum, a member of the group, who agreed to act as trustee for the Leubsdorf group in the granting of licenses under the patents, the receipt of royalties under licenses, the payment of expenses, and the distribution of the remainder of the proceeds among the members of the Leubsdorf group.
8. The minimum amount of royalty necessary to retain exclusive rights under the Rollmann patents pursuant to the agreement of November 9, 1934 was paid by United States Rubber Products, Inc., only for the initial period, which ended on July 1, 1936. Upon the termination of such initial period, the agreement became a non-exclusive license. Some small royalty payments were made by United States Rubber Products, Inc., to the Leubsdorf group after July 1, 1936, but the last of these payments was made not later than the year 1938. After 1938, the Leubsdorf group did not receive any royalty payments from United States Rubber Products, Inc.
9. (a) On September 6, 1938, there was issued to Hans Rollmann and Andreas Szerenyi United States patent No. 2,129,106, which will usually be referred to in these findings as “the Rajeh patent.”
*178 (b) Tbe Rajeh patent was related and similar, to the Rollmann patents.
(c) At all times pertinent to this litigation, the Rajeh patent was owned by a partnership known as “Roka,” which consisted of members of the Rollmann family.
• 10. (a) On. July 19, 1939, Ludwig H. Grunebaum, acting in his capacity as trustee for the Leubsdorf group, granted to Pirelli Limited, a British corporation, a non-exclusive license “to manufacture and/or. sell” footwear under the Rollmann patents in the United States for a period ending on December 31,1941. The licensor was to receive a royalty of 2 percent of the net sales price .of the footwear manufactured and sold by the licensee under the patents. .The li-censor retained the right to grant other non-exclusive licenses. The licensee had the right to renew the.license for subsequent successive periods of three years each if the royalties paid to the licensor amounted to $7,500 or more during the period ending December 31, 1941, and to $10,000 or more in each subsequent three-year period.
(b) No payment was ever made by Pirelli Limited to the Leubsdorf group under the license mentioned in paragraph (a) of this finding. Consequently, the license expired on December 31,1941. -
11. Early in 1940, Heinz Rollmann, a son of Hans Roll-mann, the inventor, came to the United States and made a proposal to the Leubsdorf group regarding the pooling of the Rollmann patents and the Rajeh patent. He told the Leubsdorf group that the Rollmann family had a patent (the Rajeh patent) which was similar to the patents owned by the Leubsdorf group (the Rollmann-patents); that the Rollmanns were interested in. having someone begin the manufacture- of footwear in the United States according to the methods outlined in these patents; and that the Rollmanns wished , to avoid, competition between themselves and the Leubsdorf group. After some- negotiations, an agreement relative to the pooling of the Rollmann patents and the Rajeh patent was signed on April 17,1940.
12. (a) The agreement of April 17, 1940 mentioned in finding 11 was signed by Ludwig H. Grunebaum, in his capacity as trustee for the Leubsdorf group (owner's of the *179 Rollmann patents), and by Heinz-- Rollmann, acting for Roka (the partnership that owned the Rajeh patent).
(b) Among other things, the agreement of April 17,1940 stated in paragraph 2 that:
* * * Grunebaum hereby delivers to Heinz Rollmann, as the representative of Roka, a Power of Attorney enabling him exclusively to grant licenses under said patents 1,955,720 and 2,168,243 at any time during the life thereof, except as provided in paragraph 4.
(c) Paragraph 4 of the agreement dated April 17, 1940 provided in material part as follows:
* * * no license agreement is to be executed under the provisions of this contract without the written approval of Grunebaum or an individual designated by Grune-baum, or his successor -for the purpose; * * *
(d) Paragraph 6 of the agreement dated April 17, Í940 provided in part as follows:
This agreement shall remain in effect to the date of expiration of each of said patents and to the date of expiration of any license agreement in which they are involved * * * .
(e) It was provided in the agreement of April 17, 1940' that all royalties from licenses .were to be paid to Chase National Bank in the City of New York as agent for the parties, and that the agent was to distribute the proceeds as follows: 60 percent to the owners of the Rajeh patent and 40 percent to the owners of the Rollmann patents.

Agreement Between Patent Owners and Rikol, Ino.

13. Leo Weill was a shoe manufacturer in Europe for a number of years prior to 1938.. Mr. Weill immigrated to the United States in 1938. After his arrival in this country, he organized a Delaware corporation under the name of Rikol, Inc., which, he proposed to utilize as a holding company through which to conduct.his business activities. At the outset, Mr. Weill was the sole stockholder and an officer of Rikol, Inc.
14. While still in Europe,-Leo Weill ha,d discussed with Heinz Rollmann the possibility of securing, the right to manufacture footwear in the United States under the Rajeh *180 patent. Early in 1940, after Mr. Weill had established himself in the United States and after Heinz Rollmann had also come to this country, Mr. Weill resumed the negotiations with Heinz Rollmann, as Mr. Weill had capital that he was interested in utilizing for the purpose of starting a shoe manufacturing business in the United States. Subsequent to the signing of the agreement dated April 17, 1940, which pooled the Rajeh patent and the Rollmann patents, the negotiations between Mr. Weill and Heinz Rollmann related to the Rollmann patents as well as to the Rajeh patent. Heinz Rollmann kept the Leubsdorf group (owners of the Rollmann patents) currently informed regarding the negotiations after April 17,1940, and Heinz Rollmann’s actions in the course of the negotiations after the date mentioned were taken with the concurrence of the Leubsdorf group.
15. During the course of the negotiations mentioned in finding 14, Leo Weill consistently took the position after April 17, 1940 that he desired to obtain exclusive rights under the Rollmann and Rajeh patents. However, he was apprised of the facts concerning the prior issuance of licenses to United States Rubber Products, Inc., and to Pirelli Limited under the Rollmann patents. The terms of the 1940 contract, as finally agreed upon, granted to Rikol, Inc., an “exclusive license (except for the two non-exclusive licenses now outstanding * * *) for the manufacture and sale of shoes * *
16. The respective parties utilized the services of experienced patent attorneys during the course of the negotiations mentioned in findings 14 and 15. These negotiations culminated in a series of drafts of a proposed agreement. The initial draft was dated August 20, 1940. It, as well as succeeding drafts, contained language granting to Rikol, Inc., “a license for the manufacture and sale of” footwear under the Rollmann patents and the Rajeh patent. In connection with the drafting of the agreement, none of the parties ever discussed the inclusion of the word “use” in, or the omission of that word from, the granting clause. The omission of the word “use” from the granting clause was inadvertent. Most of the claims under the Rollmann patents were “method” or “process” claims, and the only way to grant such *181 a claim is to permit the grantee the “use” of the process or method patented.
17. On December 19,1940, Heinz Rollmann (representing the owners of the Rajeh and Rollmann patents) and Ludwig H. Grunebaum (representing the owners of the Roll-mann patents) entered into a formal agreement with Rikol, Inc. (acting through Leo Weill). The agreement contained the following pertinent provisions:
Agreement made and entered into in the City of New York, State of New York, as of the 19th day of December, 1940, by and between Heinz Rollmann, residing at 80-28 Lefferts Boulevard, Kew Gardens, New York, acting herein individually on his own behalf and as a member of a co-partnership composed of Heinz Rollmann, Ernest Rollmann, Klaus Rollmann, Walter Kaufmann and Kurt Kaufmann, said Heinz Rollmann being hereinafter for convenience referred to as “Roll-mann”, and said co-partnership being hereinafter for convenience referred to as the “Copartnership”; Ludwig H. Grunebaum, residing at 11 Brayton Road, Scars-dale New York, hereinafter for convenience referred to as “Grunebaum”; and Rikol Inc., a corporation organized under the laws of the State of Delaware, having its principal office at No. 285 Madison Avenue, New York City, hereinafter for convenience referred to as “Rikol”.
WITNESSETH:
Whereas, Rollmann and Grunebaum represent and warrant that Grunebaum is the owner of United States Patent No. 1,955,720, dated, April 17, 1984, and is likewise the owner of United States Patent No; 2,168,243, dated August 1, 1939, which latter patent originated in application Serial Number 717,029, both of which patents relate to shoes and the manufacture thereof, and are hereinafter for convenience sometimes referred to as the “Rollmann Patents,” and
Whereas, Rollmann and Grunebaum further represent and warrant that Rollmann, by virtue of a power of attorney dated the 17th day of April, 1940, a photostatic copy of which is hereto attached and marked “Exhibit A,” has full authority to act on behalf of said Grunebaum in the granting of a license or licenses under said Rollmann Patents, and
Whereas, Rollmann further represents and warrants that individually and/or as a member of the Copartnership, he is the owner of the entire right, title and inter *182 est- in' and to United States Patent No. 2,129,106, dated September 6, 1938, said patent being hereinafter' for convenience sometimes referred to as the “Rajeh Patent”, and
íjs Hs
Whereas, the United States Rubber Products, Inc., a Delaware corporation, having its executive offices in the City and State of New York, acquired a license dated November 9th, 1934, under said patent 1,955,720 and the application which became, patent 2,168,243, which license lias become non-exclusive, and
Whereas, Pirelli, Ltd. of 343 and 345 Euston Road, London, N. W. 1, England, has by agreement dated July 19th, 1939, acquired a limited non-exclusive license under patents 1,955,720 and 2,168,243 and
Whereas, Rollmann and Grunebaum desire to license Rikol to manufacture products under the patents here-inbefore mentioned, subject to the terms and conditions hereinafter set forth,
Now, therefore, in consideration of the premises and the mutual promises and covenants hereinafter contained, the parties do hereby mutually agree as follows:
1. Rollmann, individually and as a member of the copartnership, and Grunebaum do hereby respectively grant to Rikol, subject to the conditions hereinafter set forth, an exclusive iicense (except for two non-exclusive licenses now outstanding in United States Rubber Products, Inc., and Pirelli, Ltd.) for the manufacture and sale of shoes pursuant to all of the above mentioned patents and any renewals, continuations, divisions, reissues or extensions thereof. Said license shall extend to the entire territory of the United States of America, and so long as Mr., Leo Weill, the representative of Rikol, shall remain alive and shall remain the holder of a majority of the stock of Rikol, shall likewise extend to the possessions and dependencies of the United States of America.
2. All improvements and further developments made by or for Rollmann and/or Grunebaum, or owned or controlled by-either of them relating to the inventions which are the subject matter of this Agreement will be made, available to Rikol .during the term'of this agreement without the payment of any further consideration by said Rikol.
3. All improvements and developments in -the methods of production of shoes made under the patents involved herein by Rikol, are to inure to the benefit of Rollmann and become part- of the subject matter of this *183 agreement. If any improvement made by others should come to the' attention of either Bikol or Bollmann that party will'communicate that fact to the other party and the parties will then together consider whether and if so under what conditions the patent rights relative to such improvements should be acquired, and if the parties cannot come to any agreement, the matter shall be arbitrated as hereinafter provided.
■ Hí ❖ »• H* ❖ Hi
5. ~R.ollma.Tm agrees that he will 'in conjunction with 'Mr. Leo Weill, as the representative of Bikol, supervise the making of the machinery and the implements needed for the production of 2500 pairs of shoes in 8 working hours, under the Bajeh Patent and/or Boll-mann Patents, and Bollmann does further agree that in conjunction with Leo Weill, as the representative of Bikol, he will participate and aid in the ordering of machinery and implements needed for the manufacturing of shoes under the patents involved herein. In connection with such supervision and the purchase, manufacture and ordering of machinery, it is understood that Bollmann will not unreasonably withhold or delay his consent to any acts on the part of Leo Weill as the representative of Bikol. .All machinery and implements ordered as aforesaid are to be paid for by Bikol, which shall promptly and diligently thereafter proceed with the manufacture of shoes under said patents.
6. Lt is understood that a contract shall be entered into between Bikol, or a subsidiary or affiliated company of Bikol, with a rubber company to supply rubber mixture and semi-vulcanized sole shells. - It is understood that said contract will be negotiated by Mr. Leo Weill, as the representative. of Bikol, in conjunction with Bollmann and that said contract shall be approved by Bollmann before its execution. Upon the execution of a contract as aforesaid, Bollmann agrees to place at the disposal of the management of said rubber factory all of the formulas necessary for the manufacture of the rubber materials needed by Bikol in order to fully exercise the license granted to it under the patents mentioned herein.
Y. In full compensation for the services rendered by Bollmann, as hereinbefore mentioned, and in consideration of the license herein granted with regard to the patents above mentioned, Bikol agrees to pay jointly to Bollmann and Grunebaum a • royalty computed as follows:
*184 A sum equal to three per cent (3%) of the total net cash receipts from sales (as hereinafter defined) of all shoes made and sold by Rikol under one or more of the patents above mentioned, or under any improvement patent relating to any of the above mentioned patents.
The term “net cash receipts from sales,” as used herein, shall mean the aggregate volume computed in dollars of all cash receipts from sales in the regular course of business made by Rikol, but after all deductions and allowances for returned merchandise, exchanges, allowances and discounts made by Rikol and after deducting all sums paid by Rikol for any State, Federal and/or Municipal or other sales tax on sales.
All sums due by way of royalties shall be payable on the 10th day of each month to cover the net cash receipts from sales for the preceding calendar month. All payments of royalties are to be made by Rikol, Inc. to New York Hanseatic Corporation, 120 Broadway, New York, for disposition in accordance with instructions to be given to said concern. [This paragraph as amended October 22,1941]
$ % ¡¡t Hfi *
9. The license herein granted to Rikol shall be exclusive for the duration of this agreement with respect to the Rajeh Patent, and shall be exclusive with respect to the Rollmann Patents, except for the non-exclusive license possessed by the United States Rubber Products, Inc. and Pirelli, Ltd., Rollmann and Grunebaum herein agreeing that except for the two non-exclusive licenses above mentioned, no other licenses will be granted with regard to said patents during the term of this agreement. Rollmann and Grunebaum do hereby agree that the license heretofore granted to Pirelli, Ltd., and the United States Rubber Products, Inc. will not be renewed and that no other party will be substituted in place of Pirelli, Ltd. or the United States Rubber Products, Inc. in the event of a cancellation or other termination of said license or licenses. The patents herein-before named are licensed solely and exclusively to Rikol (excepting United States Rubber Products, Inc. and Pirelli, Ltd.), subject to the conditions as set forth in this agreement. After the first two years of manufacture under this agreement, Rikol undertakes to increase its production of shoes to such an extent as in the joint and unanimous opinion of Leo Weill and Rollmann is deemed advisable; it being, of course, understood that Rikol may increase its production to any extent and at any time without the consent of Rollmann. In the event *185 of the death of either Leo Weill or Rollmann, and should the successor of the deceased party be unable to agree with the survivor on the question of the increase in production, the matter is to be submitted to and determined by arbitration as hereinafter provided in paragraph “18” hereof.
10. Rikol agrees that it will not grant sub-licenses with respect to the patents for which licenses are herein granted, or any improvements or developments with regard thereto; unless it shall first receive the written consent of Rollmaim thereto; except, however, that Rikol shall have the right to grant licenses to any corporations or other enterprises in which Leo Weill shall directly or indirectly control a majority of the stock. In any event it is understood and agreed that Rikol shall have the right to assign the within agreement to a corporation to be formed, provided that Leo Weill shall directly or indirectly control at least a majority of the stock of such new corporation, and upon such new corporation assuming in writing all of the terms and provisions of the within agreement on Rikol’s part to be performed, Rikol shall be released from any and all further liability hereunder.
Hi H* H: H« ❖
18. In the event any of the patents involved in this license are infringed by others, the party receiving information thereof shall notify the other parties and Rikol may, if it sees fit, at its own cost but in the name of the licensor, institute proceedings under said Rajeh Patent and said Rollmann Patents against the infringing party, it being understood that Rikol will pay into the trust fund mentioned in paragraph 7 Thirty Per Cent. (30%) of any damages or other emoluments, recovered by reason of such proceedings or settlement thereof after deduction from such recovered sum of all costs and expenses paid by Rikol. Rollmann and Grunebaum agree that in such event they jointly and/or individually will permit and do hereby permit Rikol the use of their names, so that the proceedings can be conducted in the names of Rollmann and/or Grune-baum, and agree further to sign all rightful documents, execute all necessary oaths, and do whatever else may be necessary to further the conduct of such proceedings, it being understood that Rikol hereby undertakes and agrees to hold Rollmann and Grunebaum free and harmless from any damage, loss, or expense in connection therewith. Rollmann and Grunebaum agree to include a similar provision to the above sentence in any assign *186 ments or transfers of patents involved in this agreement.
14. In' the. event ■ that Bikol shall .fail to make the royalty payments -hereinbefore provided and such default continues for a period of Thirty (30) days after notice by registered mail, or in the event that Bikol shall otherwise default with respect to this agreement and such default continues for a period of Thirty (30) days after notice by registered mail, then and in any such case, Bollmann and Grunebaum shall have the right to terminate the license granted to Bikol, but such termination shall not affect the duly acquired rights of Bollmann and Grunebaum. However, in the event of such termination, Bikol shall have the right to- complete all orders on hand and complete all goods in the course of production, paying the agreed royalty.
ij«
16. This agreement, unless sooner terminated as here-inbefore provided, shall continue from the date of the execution thereof for a period of Fifteen (15) years, provided that throughout said period Bikol shall continue the manufacture of shoes under the patents or methods for which the within license is granted. Delays due to floods, fire, strikes or other similar causes shall not be considered cessation of manufacture within this clause.
# # Hí ❖ ❖
19. This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, it being understood that this license is .not assignable by Bikol except under the provisions of paragraph 10 hereof.

Agreement Between Bikol, Ine., and Welleo Shoe Corporation

18. As authorized in paragraph 10 of the agreement dated December 19, 1940, Leo Weill proceeded to organize in the State of North Carolina a new corporation to undertake the manufacture of footwear under the patents. The new corporation was named the Welleo Shoe Corporation, the letters W-E-L-L being taken from Weill’s own name.
19. For several years following its organization, Leo Weill was president of the Welleo Shoe Corporation and owned a controlling interest in the corporation.
20. On March 19, 1941, an agreement was entered into between Bikol, Inc., and the Welleo Shoe Corporation, under *187 which, the former granted to the latter “an exclusive license for the manufacture and sale” of footwear pursuant to the Rollmann patents. This 1941 agreement recited that Rikol, Inc. had “obtained a license with respect to the use of” the Rollmann patents. The Wellco Shoe Corporation agreed to pay to Rikol, Inc., as royalty a sum equal to 3 percent of the net cash receipts from the sale of footwear made by the Wellco Shoe Corporation under the patents. It was provided in paragraph 7 of the agreement that:
This agreement shall commence with the date hereof and shall expire on the 19th day of March, 1942.
21. The precise relationship of Leo Weill to Rikol, Inc., on and after March 19, 1941 is not entirely clear from the evidence, but he remained with Rikol until at least 1943 by which time a Mr. Jaffin and a Mr. Schneider had become stockholders of Rikol. However, the evidence shows that Harry Schneider was president of Rikol, Inc., on March 19, 1941 and acted for Rikol, Inc., in signing the agreement of that date with the Wellco Corporation, and Leo Weill signed that agreement as president of Wellco.
22. The Wellco Shoe Corporation constructed a factory for the manufacture of footwear in Waynesville, North Carolina. The special machinery needed for the manufacture of footwear under the Rollmann patents was purchased and installed with the advice and assistance of Heinz Rollmann. The factory was completed near the end of 1941. Soon after the completion of the factory, the shortage of rubber in the United States due to war conditions made it infeasible for the Wellco Shoe Corporation to continue the manufacture of footwear under the Rollmann patents. Accordingly, the special machinery previously mentioned was “put in mothballs” for the duration of the war period, and the Wellco Shoe Corporation began to manufacture for the War Production Board items that were outside the scope of the Rollmann patents.-
23. (a) At the end of the one-year period fixed as the life of the agreement between Rikol, Inc., and the Wellco Shoe Corporation, the latter had discontinued the manufacture of footwear under the Rollmann patents because of the wartime shortage of rubber. Nevertheless, the expiration *188 of the one-year agreement was discussed by Leo Weill with Heinz Rollmann, who had become or was about to become an employee of the Wellco Shoe Corporation. Heinz Roll-mann told Mr. Weill that:
We don’t have to make a new agreement, since I am entering the company anyhow.
(b) The one-year agreement dated March 19, 1941 between Rikol, Inc., and the Wellco Shoe Corporation was not extended by any written instrument.
24. Leo Weill retained a controlling interest in the Wellco Shoe Corporation until 1944 or 1945. He then sold some of his stock to Heinz Rollmann and some to a man named Feistmann. After the sale of the stock, Mr. Weill only had a one-third interest in the Wellco Shoe Corporation.

Postwar Activities

25. When rubber became available after the end of World War II, the Wellco Shoe Corporation resumed the manufacture of footwear in accordance with the methods outlined in the Rollmann patents. That was sometime in 1945. No written document was prepared at that time or thereafter for the purpose of granting to the Wellco Shoe Corporation rights under the Rollmann patents. However, Heinz Roll-mann, who was given the licensing power subject to certain limitations with respect to such patents by virtue of the agreement dated April 17,1940 (see finding 12), was by that time an officer and stockholder of the Wellco Shoe Corporation, and was actively engaged in the management of the company’s affairs.
26. After resuming the manufacture of footwear under the Rollmann patents in 1945, the Wellco Shoe Corporation continued such manufacture down to the date of the trial in this case, without any objection from the owners of the Rollmann patents or from Rikol, Inc.
27. (a) From 1945 until 1947, the Wellco Shoe Corporation made payments to the owners of the Rollmann and Rajeh patents (which had been pooled in the agreement of April 17, 1940) calculated on the basis of 8 percent of the net cash receipts from the sale of footwear manufactured *189 under the Rollmann patents. For the period beginning in 1947 and extending to the date of the trial of this case, the payments were calculated on a 2-percent basis. This change was made apparently as a result of the writing of the letter mentioned in finding 30.
(b) No payments were made by the Wellco Shoe Corporation directly to Rikol, Inc., during the postwar period. New York Hanseatic Corporation, which had been design nated in the 1940 agreement between Rikol and the Leubs-dorf group to receive all payments made by Rikol, received payments from Wellco and transmitted them to plaintiff and the other parties. The 1941 contract between Rikol and Wellco made no provision for the transmittal of payments.
28. (a) On July 1, 1946, the members of the Leubsdorf group (owners of the Rollmann patents) entered into a partnership agreement creating a partnership known as Karl & Company. The agreement contained the following pertinent provisions:
Whereas, the parties together are the owners of United States Patents numbered respectively 1,955,720 and 2,168,243 relating to shoes and the manufacture thereof, together with the right to seventy-five percent. (75%) of the income from a license agreement dated November 9, 1934 to United States Rubber Products Inc. (it being understood that the right to the remaining twenty-five percent. (25%) of said income from said license has been heretofore transferred to the predecessors in interest of Hansea Corporation, and that one-half of said twenty-five percent. (25%) has heretofore become vested in Karl Leubsdorf and that no part of said twenty-five percent. (25%) is being or is to be transferred to the partnership herein), and the right to certain portions of the income from license agreements with Rikol, Inc. and Wellco Shoe Corporation (such patents and the right to income under such license agreements being hereinafter for convenience sometimes referred to collectively as the “basic patents”); and
‡ $ $ ‡ #
WITNESSETH :
1. The business of the partnership shall be to hold and exploit said basic patents and any other property which the partnership shall hereafter acquire in connection therewith or as a result of said business.
*190 2. The partnership shall be carried on under the firm name of Karl & Co., and the place of business of the partnership shall be at 25 Broad Street, New York City and/or such other place or places as the partners shall hereafter determine. The term of the partnership shall be until the expiration of said basic patents and any new patents covered by this agreement and of know-how and general assistance agreements covered hereby.
3. The respective interest of each of the partners in said basic patents is as follows:
Ludwig H. Grunebaum_22/150
Amber L. Diclte_12/150
Friedel Lachhein_12/150
Gerhard Wagner_12/150
Sophie Boschwitz_10/150
Carl H. Dicke_ 5/150
Karl Leubsdorf_ 77/150 (exclusive of said interest in the income under said United States Rubber Products Inc. license).
4. Each of the partners hereby contributes to the partnership his or her respective undivided interest in said basic patents, except that Karl Leubsdorf does not contribute his said interest in the income under said United States Rubber Products Inc. license. The capital of the partnership shall consist of'said basic patents and any other property which the partnership shall hereafter acquire in connection therewith or as a result of said business. The interest of each of the respective partners in the capital of the partnership shall be the amount set forth after his or her respective name in paragraph “3” above.
5. Each partner shall share in the profits and losses of the partnership in accordance with the percentage of his or her interest in the capital of the firm. The profits of the partnership shall be divided among the partners as the partners shall from time to time determine.
6. The affairs of the partnership shall be managed by seventy-five_percent. (75%) in interest of the partners, and the decision of 75% in interest made in good faith shall be binding on all the partners. No partner shall do any act or enter into any transaction on behalf of the partnership .or with respect to any partnership property without the consent of 75% in interest of the partners.
7. No partner shall assign, mortgage or sell his or her share in the partnership or any part thereof, nor enter into any agreement as a result of which any person. *191 firm or corporation shall become interested in the partnership or the assets of the partnership, without the written consent of 75% in interest of the other partners.
(b) Effective January 1,1952, the partnership agreement referred to in paragraph (a) of -this finding was modified so as to provide that Karl Leubsdorf should receive 7% percent of the partnership’s profits as a management fee, and that the remaining 92y2 percent should be distributed among the partners in the respective proportions prescribed by the agreement.
29. Sometime in 1947, Leo Weill sold the remainder of his stock.in the Wellco Shoe Corporation and severed all connection with that company. Mr. Weill was succeeded in the presidency of the Wellco Shoe Corporation by Heinz Eoll-mann, who was still president of the company at the time of the trial in this case. •
30. (a) Under the date of May 27,1947, Heinz Eollmann, who was then president of and a.stockholder in Wellco and who was acting as the representative of the owners of the Eollmann and Eajeh patents, addressed to Eikol, Inc., a letter stating in part as follows:
1. It is understood that for a period of five'years beginning with the date hereof, the royalties tobe paid by you pursuant to the license agreement dated December 19th, 1940, as previously amended and supplemented, shall be reduced to the sum of 2% in lieu of the 3% provided for in the present agreement.
* % ' % * #
3. In recognition of- the cooperation which the patent holders are extending to you, you agree that after the expiration of the present agreement dated December 19th, 1940, you will continue to pay a royalty at the rate of 1% on gross receipts from.sales of sponge rubber shoes made pursuant to the patent for a period of five years, and otherwise extend the terms of the agreement dated December 19th, 1940, as heretofore amended, for a period of five years.
(b) A representative of Eikol, Inc., Otto Feistmann, agreed to and accepted the proposal outlined in the letter of May 27,1947. Feistmann was a stockholder in Wellco; it is not known whether he owned stock in Eikol or was merely the agent of Eikol.
*192 (c) Rikol, Inc., never paid any royalties directly to the owners of the Rollmann and Raj eh patents, either before or after May 27,1947. The evidence does not show whether the payments referred to in finding 27 (b) were made by Wellco pursuant to its 1941 agreement with Rikol.
31. Late in 1946 or early in 1947, Karl & Company entered into an agreement with Roka (the partnership that owned the Rajeh and other patents), with a North Carolina corporation bearing the name of Ro-Search Incorporated, and with The Rollmanns (a partnership of which Heinz Roll-mann was a member). The agreement was dated retroactively as of May 1,1945, a date prior to the formation of the partnership known as Karl & Company. It contained the following pertinent provisions:
WITNESSETH:
Whereas, Karl is the owner of United States patents numbered respectively 1,955,720 and 2,168,243 relating to shoes and the manufacture thereof, but subject to a prior license agreement dated November 9, 1934 to United States Rubber Products, Inc.; and
Roka is the owner of United States patents 2,129,106 and 2,256,329 also relating to shoes and the manufacture thereof; and
Licenses under United States patents numbered respectively 1,955,720, 2,168,243, 2,129,106 and 2,256,329 (hereinafter referred to as the “basic patents”), exclusive except for any rights held by United States Rubber Products, Inc., have been granted to Rikol, Inc., a corporation organized under the laws of Delaware, having its principal office at 295 Madison Avenue, New York City, and Wellco Shoe Corporation, a corporation organized under the laws of North Carolina, having its principal office at Waynesville, North Carolina, the royalties under which are now payable to Karl and Roka; and
Whereas, Roka owns fifty percent (50%) of United States patent numbered 2,178,086 (Paraflex), all of patent 2,357,360 (Molded Snowboot), and all of an application for a United States patent Serial No. 552,469 (a division of the Molded Snowboot), all of application for United States Patent Serial No. 658,998 (Counter Construction), and application for United States Patent Serial No. 775, 682 (a division of Application Serial No. 552,469, all of which relate to shoes and the manufacture thereof; and
*193 Whereas, Ro-Search and/or the Rollmans intend to engage in research work relating to improvements on said basic patents as well as the development of additional improvements in the shoe field and in other fields, related and unrelated to the manufacture of shoes, and intend to enter into know-how and general assistance agreements relating to the basic patents and the manufacture of shoes and other processes and products; and ‡ ‡ ‡ ‡
Now, therefore, it is mutually agreed as follows:
1. Ro-Search and the Rollmans agree to devote themselves chiefly to the development of improvements on the basic patents and to the development of new improvements, inventions and patents in the shoe field and in other fields, and to the making of know-how and general assistance agreements in the shoe field and in other fields for the benefit of all the parties hereto, and to pay all the expenses of such work out of the payments provided for by paragraph “6” of this agreement.
2. All future improvements on the inventions of the basic patents as well as on the inventions of other patents in the shoe field or in other fields, and all future know-how and general assistance agreements developed or made by Ro-Search or the Rollmans, shall be covered by this agreement.
3. During the term of this agreement the Rollmans will engage in development and research and in work under know-how and general assistance agreements only as employees of Ro-Search or as members or employees of the firm of the Rollmans.
4. During the term of this agreement Ro-Search or the Rollmans are hereby given the exclusive right to enter into license agreements, know-how agreements and general assistance agreements covered by this agreement, and Karl and Roka have delivered to Ro-Search and the Rollmans powers of attorney enabling them to carry out their powers under this paragraph, subject, however, to the condition that Ro-Search and the Roll-mans shall exploit same with due diligence and shall otherwise perform its obligations hereunder.
5. The following four classes of income subject to this agreement shall be divided among the parties in the percentages set forth in paragraph “6” hereof:
a. (1) Receipts from license and know-how agreements relating to the basic patents (excluding the 25% royalty payable to Hansea Corporation under said license agreement dated November 9, 1934 to United States Rubber Products Inc.);
*194 (2) Improvements on said patents developed by Ro-Search or the Rollmans covering the manufacture or sale of products in the United States or Canada; and
(3) Receipts from all license and know-how agreements to or with Rikol and/or Wellco Shoe Corporation relating to rubber shoes.
b. (1) Receipts from license- and know-how agreements based on inventions, not comiected with the basic patents, developed by Ro-Search or the Rollmans covering the manufacture or.sale of products or processes in any part of the world;
(2) Receipts from license and know-how agreements based on improvements on the basic patents, developed by Ro-Search or the Rollmans covering the manufacture or sale of products in any part of the world other than the United States and Canada;
c. Receipts from license and know-how agreements relating to United States patents numbered respectively 2,178,086 and 2,357,360 and United States applications numbered respectively 552,469, 775,682 and 658,998;
d. Receipts from general assistance agreements entered into by Ro-Search or the Rollmans relating to the manufacture of products in the United States, except, however, that the general assistance agreement with Rikol and Wellco relating to soTcalled Compo-slippers shall be included within subdivision “a” of this paragraph.
The term “general assistance agreements” as used herein .shall mean and include any agreements made by Ro-Search or the Rollmans covered hereby which are ■not based upon and do not relate to or include any patents or inventions. .
6. The gross receipts'from.such.four classes of income shall be divided among the parties in the- following percentages:
a. Ro-Search and the Rollmans shall be reimbursed therefrom for all reasonable expenses connected with the collection of such receipts.
b. Until the combined share of the gross receipts of Ro-Search and the Rollmans under this subparagraph “b” of paragraph “6” shall equal the sum of $20,000 in any one calendar year, the proceeds of -such calendar year shall be divided as follows:
As to the receipts covered by subdivision “a” of paragraph “5”:.Roka — 51%, Karl — 34%, Ro-Search and the Rollmans together — 15 %.
*195 '..¡As to the receipts covered by subdivision “b”, “c” and “d” of paragraph “5”: Itoka — 65%, Karl — 20%, Ro-.Search and the Rollmans together — 15%.
c. After the combined shares of such gross receipts of Ro-Search and the Rollmans under the foregoing sub-paragraph “b” of this paragraph “6” shall have reached $20,000 m any one calendar year, the balance of said receipts for the remainder of such calendar year shall be divided between Roka and Karl in the following percentages:
As to me receipts covered by subdivision “a” of paragraph^”: Roka — 60%, Karl — 40%.
As to the receipts covered by subdivisions “b,” “c,” and “d” of paragraph “5”: Roka — 74%, Karl — 26%.
7. Roka shall have an undivided interest of 60% in all improvements discovered by Ro-Search or the Roll-mans on said basic patents and an undivided interest of 74% on any other patents or inventions discovered by Ro-Search or the Rollmans.
8. Karl shall have an undivided interest of 40% in all improvements discovered by Ro-Search or the Roll-mans on said basic patents and an undivided interest of 26% of any other United States and Canadian applications and patents on inventions discovered by Ro-Search or the Rollmans, which interests are to be evidenced by assignments in proper form for recording in the United States and Canadian Patent Offices, but itarl ■shall record the same only after previous consultation with Ro-Search or the Rollmans.
11. This agreement shall remain in effect until the expiration of all of the basic patents (including patented improvements thereon) and the expiration of all new patents covered .by this agreement and of all know-how or general assistance agreements covered hereby.
H» «I* *!•
14. Anything herein contained to the contrary notwithstanding, no license agreement under said United States patents numbered respectively 1,955,720 or 2,168,243 shall be made (or modified) by Ro-Search or the Rollmans without the approval ox Karl; but license or know-how agreements covering improvements on said patents may be made by Ro-Search or the Rollmans without the written approval of Karl if within a two-month period an agreement cannot be reached between' Karl and Ro-Search and the Rollmans on any such license or know-how agreements. Should Ro-Search or *196 the Rollmans execute any such license or know-how agreements without the. written approval of Karl as provided in this paragraph, then the power of authority enabling Ro-Search and the Rollmans exclusively to grant licenses under said patents numbered respectively 1,955,720 and 2,168,243 shall thereupon be terminated and Karl shall thereupon have exclusive authority to grant licenses under said patents.
32. The license agreement of November 9, 1934, with United States Rubber Products, Inc. (see finding 5), was formally canceled by means of a written notice that was issued to the licensee sometime in 1950. The basis for the cancellation was the failure of the licensee to perform its obligations under the license agreement.
33. (a) On September 21,1951, the Wellco Shoe Corporation, Ro-Search Incorporated, and The Rollmanns entered into an agreement with the General Shoe Corporation, a Tennessee corporation, whereby the General Shoe Corporation was granted “an exclusive right and license, except as hereinafter retained by Licensors, to manufacture and sell throughout the United States of America footwear covered by” the Rollmann and Raj eh patents, as well as other related patents.
(b) The granting of the license mentioned in paragraph (a) of this finding did not affect the operations of the Wellco Shoe Corporation in manufacturing and selling footwear under the Rollmann patents.

Administrative Proceedings

34. At all times relevant to this case, the plaintiffs kept their books and filed their Federal income fax returns on the cash basis of accounting and for calendar years.
35. (a) The portion of Karl Leubsdorf’s income for the years 1951, 1952, and 1953 attributable to the transactions involved in these findings were as follows:
1951-$10, 581.45
1952- 13,500.15
1953- 14, 354.15
(b) The amount of $10,581.45 received by Mr. Leubsdorf in 1951 consisted principally of his proportionate share of the payments made by the Wellco Shoe Corporation on account of the manufacture of footwear under the Rollmann *197 patents during that year. However, this figure for 1951 also included some income representing Mr. Leubsdorf’s proportionate share of the royalties under licenses issued by Ro-Search Incorporated granting the right to use the Rollmann. patents in foreign countries.
(c) The amounts of $13,500.15 and $14,354.15 received by' Mr. Leubsdorf during 1952 and 1953, respectively, consisted principally of his proportionate share of the payments made by the Wellco Shoe Corporation on account of the manufacture of footwear under the Rollmann patents during each of those years, but each of these figures also included Mr. Leubsdorf’s management fee from Karl & Company, his proportionate share of the royalties paid by the General Shoe Corporation on account of the manufacture of footwear under the Rollmann patents and other patents covered by the agreement of September 21, 1951, and his proportionate share of the royalties received under licenses issued by Ro-Search Incorporated granting the right to use the Rollmann patents in foreign countries.
36. The plaintiffs filed joint income tax returns for the years 1951, 1952, and 1953. The several amounts referred to in finding 35 were reported by the plaintiffs on their returns for the respective years as income from royalties Such amounts were treated by the plaintiffs as ordinary income. The returns showed adjusted gross income, net income, and tax (which was timely paid)', as follows:
Adjusted gross income Net income Tax
1951. $54,526.29 $49,067.44 $17,951.96
1952. 59,718.69 52,722.64 21,541.96
1953. 53,742.64 46,431.57 17,719.57
37. On March 1,1955, the plaintiffs duly filed with the Internal Revenue Service claims for partial refunds of the income taxes that they had paid for the years 1951, 1952, and 1953. The amounts (plus interest) claimed for the respective years were as follows:
1951_$2,382.89
1952_ 3, 879.38 '
1953_ 3,081.38
*198 The refunds were claimed on the ground that the amounts which the plaintiffs had reported as royalties on their income tax returns for the respective years should have been treated as long-term capital gains.
38. The claims referred to in finding 37 have not been allowed by the Internal Revenue Service.
39. Karl Leubsdorf’s interest in the Rollmann patents had no remaining basis as of January 1,1951.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and their petition is therefore dismissed.

 Bertha Leubsdorf is a party to this suit only because she filed joint income tax returns with her husband, Karl Leubsdorf, for the years here in question.

 Karl Leubsdorf has never acted as a broker or agent for others in connection with the sale of patents, or the issuance of licenses under patents, and except for the patent interests involved in this suit, he has never owned any patents or interests in patents, and since he had held the patents here in question for more than 18 months prior to December 19, 1940, they were capital assets in his hands.