## BELL INTERCONTINENTAL CORPORATION
### v.
### The UNITED STATES.
### No. 92–62.

United States Court of Claims.
July 20, 1967.

Richard E. Moot, Buffalo, N. Y., for plaintiff. Mason O. Damon, Buffalo, N. Y., attorney of record; Robert J. Hodgson and Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y., of counsel.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Richard C. Pugh and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

OPINION

PER CURIAM.

This case was referred to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on November 28, 1966. Plaintiff excepted to the commissioner's report and opinion only as to a single question of law pertaining to the Agusta 47–J and Nippon 47–D–1 agreements and the defendant excepted only as to the Houde agreement. The case was submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's findings, opinion and recommended conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, the court concludes as a matter of law (i) that the payments Bell received in the years 1953–1958 pursuant to the Houde, Square D, Weatherhead, Wiesner-Rapp, Scovill and Prime Mover agreements were properly taxable as long-term capital gains rather than ordinary income, and plaintiff is entitled to recover accordingly; (ii) that the payments Bell received in the years 1953–1958 pursuant to the Agusta Model 47–J agreement were properly taxable as ordinary income rather than long-term capital gains, and plaintiff is not entitled to recover in regard to such payments; (iii) that the payments Bell received pursuant to the Agusta Model 48 agreement were properly taxable as long-term capital gains, and defendant is not entitled to an offset in regard to such payments; and (iv) that the payments Bell received pursuant to the Nippon agreement were properly taxable as ordinary income rather than long-term capital gains, and defendant is entitled to an offset in regard to such payments.

Judgment is entered to this effect with the amount of recovery to be determined pursuant to Rule 47(c).

OPINION OF COMMISSIONER *

MALETZ, Commissioner.

This is a suit for refund of income taxes for the years 1953–1958 and excess profits taxes for the year 1953. At issue is whether payments received under each of nine separate agreements transferring patent and other rights were payments for the sale of those rights taxable as long-term capital gains or payments for the license of such rights taxable as ordinary income.[1]

Plaintiff is a successor in interest, by consolidation, to the former Bell Aircraft Corporation (Bell), an aircraft manufacturer. During the years involved in this suit, 1953–1958, Bell received certain payments pursuant to seven agreements transferring patent and other rights known as the Houde, Square D, Weatherhead, Wiesner-Rapp, Scovill, Prime-Mover and Agusta Model 47–J agreements (which will be discussed below). For the years 1953–1956, Bell reported the payments on its income tax returns as ordinary income and paid the taxes thereon. For the years 1957 and 1958, Bell reported the payments on its tax returns as long-term capital gains and the Internal Revenue Service assessed various tax deficiencies which were paid by Bell. Bell then filed claims for refund for the years 1953–1958 which were disallowed, whereupon the present suit was instituted. Subsequently, defendant asserted, by way of offset, claims in regard to payments received by Bell in some of these same years pursuant to two other agreements transferring patent and other rights known as the Agusta Model 48 and Nippon agreements (which will also be discussed below).

By way of background, a patent confers upon the owner the right to exclude others from making, using or selling the invention during the life of the patent, and in order that a transfer constitute a sale, there must be a grant of all substantial rights of value in the patent. The transfer of anything less is a license which conveys no proprietary interest to the licensee. E. g., Waterman v. MacKenzie, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891); Merck & Co. v. Smith, 261 F.2d 162, 164 (3d Cir.

---

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

1. The applicable statutory provisions are sections 1221 and 1222 of the Internal Revenue Code of 1954 (26 U.S.C. (1958) §§ 1221, 1222) and the similar provisions in sections 117(a) (1) and (4) of the Internal Revenue Code of 1939 (26 U.S.C. (1946) §§ 117(a) (1) and (4)). Section 1221 of the 1954 Code provides:
 CAPITAL ASSET DEFINED.
 For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
 (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
 (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
 (3) a copyright, a literary, musical, or artistic composition, or similar property * * *
 (4) accounts or notes receivable * * *
 (5) an obligation of the United States, etc. * * *
Section 1222 provides:
 Other terms relating to capital gains and losses.
 For purposes of this subtitle—* * *
 (3) Long-term capital gain.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income * * *
 There is no dispute that all the inventions in the various agreements constituted capital assets which were held for more than six months. It is also apparent from the record that the patents involved were not held by the taxpayer primarily for sale to its customers in the ordinary course of its business—and defendant does not argue to the contrary.

1958); Lockhart v. Commissioner, 258 F.2d 343, 349 (3d Cir. 1958). Whether a transfer constitutes a sale or license is determined by the substance of the transaction and a transfer will suffice as a sale if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all his substantial rights to the invention. Reid, 26 T.C. 622, 632 (1956); Eterpen Financiera Sociedad de Responsabilidad Limitada v. United States, 108 F.Supp. 100, 104–105, 124 Ct.Cl. 20, 28–30 (1952), cert. denied, 346 U.S. 813, 74 S.Ct. 22, 98 L.Ed. 340 (1953). The question does not depend upon the labels or the terminology used in the agreement; hence, the fact that an agreement is termed a license and that the parties are referred to as licensor and licensee is not decisive. E. g., Kronner v. United States, 110 F.Supp. 730, 734, 126 Ct.Cl. 156, 163 (1953); Watson v. United States, 222 F.2d 689, 691 (10th Cir. 1955); Kimble Glass Co., 9 T.C. 183, 190 (1947). Nor is the question governed by the method of payment, and it is, therefore, immaterial that payment is based on a percentage of sales or profits, or on an amount per unit manufactured. E. g., Reid, supra, 26 T.C. at 632; Myers, 6 T.C. 258 (1946); Allen v. Werner, 190 F.2d 840 (5th Cir. 1951). Moreover, clauses in an agreement permitting termination by the grantor upon the occurrence of stated events or conditions will not preclude the transaction from being considered a sale; such clauses are uniformly treated as conditions subsequent, akin to provisions in realty conveyances calling for reversion of title previously vested. Kronner v. United States, supra, 110 F.Supp. at 734, 126 Ct.Cl. at 163; Commissioner v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339, 341–342 (1944); First National Bank of Princeton v. United States, 136 F.Supp. 818, 822–823 (D.N.J.1955); Massey v. United States, 226 F.2d 724, 727 (7th Cir. 1955). The fact, too, that the *grantee* has the right to terminate the

agreement at will does not defeat a sale. E. g., Allen v. Werner, supra, 190 F.2d at 842; Lawrence v. United States, 242 F.2d 542 (5th Cir. 1957); Myers, supra, 6 T.C. at 264; Golconda Corp., 29 T.C. 506 (1957).

It is in this setting that we now examine each of the nine agreements here involved.

### THE HOUDE AGREEMENT

Bell and Houde Engineering Corporation entered into an agreement dated September 15, 1940, whereby Bell granted to Houde the sole and exclusive right and license to manufacture, use and sell, and sublicense others to manufacture, use and sell an anti-shimmy device covered by a United States patent application Bell then had pending.[2] The rights granted to Houde extended to the United States and its possessions, and the agreement was to remain in effect until the expiration date of the last expiring United States patent which might thereafter issue upon such application.

If both parties desired to bring suit for infringement, the suit could be brought in Bell's name, with the expenses and any recovery to be shared equally. In the event only one party desired to bring suit, such suit could be brought in Bell's name, with the expenses to be borne by and any recovery to be retained by the party instituting the suit.

The agreement could be terminated by mutual consent of the parties, and Houde could terminate by giving six months notice. Bell had no right of cancellation.

The agreement was expressly made subject to a cross-licensing agreement of the Manufacturers Aircraft Association (MAA), an organization comprised of aircraft manufacturers and holders of aircraft patents. Bell as a member of the Association was bound by the terms of this agreement and required, at the time of its agreement with Houde, to provide that it be subject to the prior MAA agreement. In essence, the MAA cross-

---

**2.** The device worked like a shock absorber and decreased the oscillation of a plane's nose wheel from side to side when the plane was taxiing at high speeds.

license agreement was an agreement between all member aircraft manufacturers or holders of aircraft patents with respect to the manufacture and use of each other's inventions. The agreement was limited to airplane patents which had been issued by the United States and allowed the MAA member to manufacture the patented device only for installation on his own aircraft and not for sale to others. More particularly, under the terms of the MAA agreement each member of the Association agreed to grant all the other members a non-exclusive license to make, use and sell airplanes under all patents owned, controlled or licensed by the member. All licenses so granted were to run for the full term of the patent, regardless of whether the granting member withdrew from the Association prior to expiration of the patent. Upon withdrawal, however, the member lost all his right to patents owned or controlled by the other members. See Young v. Commissioner, 269 F.2d 89, 91–92 (2d Cir. 1959). The rights granted under the license were subject to the following limitations: (1) they did not extend to the invention until and unless a patent was issued by the United States Patent Office; (2) they applied to airplane patents only as defined by the agreement; (3) the rights were limited to the manufacture of the invention for installation on the member's own aircraft and not for sale to others. Under the MAA agreement a member was given a right to receive royalty income contingent upon the following conditions: (1) the issuance of a patent by the United States Patent Office; (2) submission of a claim to the MAA; (3) the MAA in an arbitration proceeding, upon the application of the member, determined that the invention sufficiently advanced the art so as to entitle the member to a monetary award and payment from other members; (4) other members of the MAA elected to manufacture ·the device for installation on aircraft manufactured by them.

Some 10 months after the Houde agreement was executed, the patent on the anti-shimmy device was issued. Within 30 days after this, Bell reported the patent to the MAA and requested royalties on the device. The usual MAA arbitration proceedings were held, and the MAA made an award to Bell. Later, the MAA made another award to Bell which removed the limit on the maximum compensation Bell could receive on the device and stated that royalty payments on the device were to continue until the patent expired. During the years involved in this suit, three MAA members (Boeing, Lockheed, and Douglas Aircraft companies) manufactured the anti-shimmy device for use on their airplanes and by virtue of the MAA award, paid Bell royalties of some $59,000.

Shortly after the execution of the Houde agreement and with the increase in tempo of World War II in Europe, the agreement between Bell and Houde was amended to provide that if and to the extent that Houde or its sublicensees failed to supply the reasonable requirements of Bell and other United States aircraft manufacturers for the anti-shimmy device, Bell was to have the right to have manufactured or itself manufacture the anti-shimmy device and to use and sell the device. Houde was one of the country's leading manufacturers of shock absorbers and other automotive parts, and the purpose of the amendment was to insure a second source of supply and protect Bell (and presumably the United States Government, its principal, if not only customer) in the event of a catastrophe or some other unforeseen event which would prevent Houde from meeting Bell's needs. Other amendments to the Houde agreement were also effected adjusting the rate of royalty payments to reflect the market demand for the anti-shimmy device and to reduce the royalties payable by the United States.

██ The factual situation thus recounted points to the conclusion that Bell transferred all its substantial rights in the anti-shimmy device to Houde and that the Houde agreement, therefore, constituted a sale rather than a license. Bell

granted to Houde, subject to the MAA cross-license agreement, the sole and exclusive right to manufacture, use and sell the invention. The rights thus transferred extended to the United States and its possessions, and the agreement lasted until the expiration date of the last patent that might issue upon the invention. Houde was granted the right to bring suit for infringement in the name of Bell and to retain any recovery in the event Bell should not desire to join in such suit. Bell had no unilateral right to terminate the agreement, although Houde could terminate on six months notice. Thus, upon execution of the Houde agreement, Houde and its sublicensees, if it chose to sublicense, became not only the holder of all substantial rights in the patent, but stood in the place of Bell as holder of the invention in the United States and its possessions for the life of any patent which might thereafter issue upon such application. So long as Houde lived up to the terms of its agreement, there was no way in which Bell could recapture its patent or even manufacture for its own use without the consent of Houde.

 Nor is a different result required by reason of the fact that the transfer to Houde was subject to the MAA cross-license agreement. Under the MAA agreement, each member was required to contribute its inventions and patents, and all future agreements with non-MAA members were expressly subject to this limitation. The MAA agreement was, therefore, a previously imposed limitation upon, not a reserved right to, the invention. Stated otherwise, Bell, by reason of its membership in the MAA, granted what amounted to a non-exclusive and irrevocable limited license for all other members of the Association to manufacture and use the invention—when patented—in the planes they themselves produced. When Bell later granted to Houde the exclusive right, subject to the MAA agreement, to manufacture, use and sell the invention, Bell divested itself of all control and ownership right in the in-vention, the effect of the reference to the MAA agreement being to recognize the prior limited grant to other MAA members to manufacture and use, but not to sell, the device. By analogy, the Houde transaction would thus seem no different in principle than one in which a grantor conveys a fee simple interest in land, subject to an irrevocable easement in perpetuity the grantor had previously conveyed to a third party. The fact that the grantor in such circumstances reserved the right to obtain future payments from the easement holder does not mean that the grantor retained a continuing property interest in the realty—indeed, in the present illustration he divested himself entirely of that; it means rather that the grantor retained a contractual right vis-a-vis the easement holder to receive payments for an interest already conveyed. Similarly, Bell's right—dependent upon the MAA arbitration proceedings—to receive future payments for the limited license it previously conveyed was based not on a continuing proprietary right in the invention, but on a contractual right to receive payments for a prior transfer.

 Though a "hard" precedent is lacking, the case law, too, would indicate that a sale is not defeated because the agreement was subject to an existing limited license previously granted. Thus in General Aniline & Film Corp. v. Commissioner, 139 F.2d 759 (2d Cir. 1944) a sale was held to have taken place notwithstanding that the patent assignment was to be "subject to all prior commitments of * * * [the grantor] including certain exclusive obligations to various named corporations." Id. at 760. In the court's view it seemed to be of no significance, with respect to the transfer of title, whether, when a patent is assigned, the assignee simultaneously grants a license to the assignor or the assignor reserves a license. "Nor does it seem to us important, in such a context [the court added], that the assignor, before making the assignment, had granted to others some rights under the

patent." Id. at note 2.[3] Likewise in Rollman v. Commissioner, 244 F.2d 634 (4th Cir. 1957), an agreement was found to be a sale notwithstanding that it was apparently subject to two existing non-exclusive licenses previously granted.[4] Contrary is First National Trust & Savings Bank of San Diego v. United States, 200 F.Supp. 274 (S.D.Cal.1961), holding that the grant of an exclusive license to make and sell a patented invention, subject to a previously granted non-exclusive license, was not a sale. To constitute a sale, the court concluded, a conveyance is required of all substantial rights given by a patent *when issued* and, therefore, a sale is not accomplished by a grant of all substantial right *remaining* in the transferor at the time of transfer. Alternatively, the court considered that even if the latter method of appraisement was the proper criterion, the transferor's retention of the right to receive royalties from the limited license constituted retention of a substantial right. The first basis for the holding—that a sale requires transfer of all substantial rights in the patent *when issued*—would appear inconsistent with what would seem an established principle that for capital gain purposes, a taxpayer may sell a partial interest in an invention. E. g., Kavanagh v. Evans, supra, 188 F.2d at 236; Walen v. United States, supra, 273 F.2d at 602, note 3. Indeed, it has been held that for capital gain purposes the patent grant may be separated into different fields of application and each field transferred to a different transferee, with each transfer qualifying separately as a sale. Rouverol, 42 T.C. 186 (1964). To like effect, capital gain treatment has been allowed for a transfer limited to one industrial use only, First National Bank of Princeton v. United States, 136 F. Supp. 818, 823–824 (D.N.J.1955); for a transfer of only one of the claims in the general patent, Merck & Co. v. Smith,

3. Judge Frank who wrote for the court in *General Aniline* made the following supplemental comment in Rohmer v. Commissioner, 153 F.2d 61, 64 (2d Cir. 1946): "[T]here [in *General Aniline*] we held that the transfer was such that the transferee probably acquired title to the patents; at any rate we considered that virtually all the patentee's rights passed to the transferee, so that there was a sale. * * * To be sure, in the *General Aniline* case * * * we said that it was unimportant that the patentee, before making the assignment, 'had granted to others some rights' under the patents; but, as the record shows that the extent of those previous grants was not disclosed to us, we must be taken as having regarded them as relatively insubstantial; consequently, as we regarded the case, the patentee had transferred to a single grantee substantially all the rights it had originally acquired as patentee under the patents."

4. The point does not appear to have been litigated in *Rollman* and its force as a precedent is thus considerably lessened. It is interesting to note that the lower court (i. e., the Tax Court) in *Rollman* (while reversed on other grounds by the Fourth Circuit) seems to have taken it for granted—that the existence of the two previously granted non-exclusive licenses did not prevent the transaction from being a sale. Rollman, 25 T.C. 481 (1955).

The Sixth Circuit has gone considerably farther and held a transaction to be a sale notwithstanding that the grantor retained the right to make, use and sell with power to transfer this right from himself to one other person, the court observing that "[i]t was entirely lawful for * * * [the grantor] to retain an undivided part or share of his exclusive patent rights." Kavanagh v. Evans, 188 F.2d 234, 236 (6th Cir. 1951). The decision in Kavanagh v. Evans, however, has been questioned in Walen v. United States, 273 F. 2d 599 (1st Cir. 1959), and a contrary result was reached in Allied Chemical Corp. v. United States, 17 AFTR 2d 316 (S.D.N.Y.1966), aff'd 370 F.2d 697 (2nd Cir. 1967). In Walen v. United States, the First Circuit observed (273 F.2d 599 at note 3): "We do not question that a taxpayer might sell a partial interest in an invention. However, to do so it should be a transfer of a measurable, identifiable share, and not of an undefined one of elastic proportions dependent upon how many subsequent 'shares' the grantor might elect to create." It may be added that in the present case, by contrast, Bell's assignment to Houde was the "transfer of a measurable, identifiable share" which Bell could not later enlarge or diminish in any way, having through such transfer divested itself of all its remaining ownership right in the invention. *Allied Chemical* is discussed below.

261 F.2d 162 (3d Cir. 1958); and for a transfer limiting the use of the patent to a particular territory or industry. United States v. Carruthers, 219 F.2d 21 (9th Cir. 1955); cf. American Chemical Paint Co. v. Smith, 131 F.Supp. 734 (E.D.Pa.1955).[5] Nor can I agree that the grantor's retention in the *San Diego* case of a right to receive future payments under the limited license constituted the reservation of a "substantial right" in the patent. The "substantial right" in a patent, the retention of which by the grantor will preclude a sale, has reference —as seen above—to the substantial *property* right in a patent, i. e., the right to exclude others from making, using or selling under the patent grant—and not to the grantor's contractual right to obtain future payments in return for his conveyance of that property right.[6]

Allied Chemical Corp. v. United States, supra, note 4, on which defendant places emphasis, is clearly distinguishable from the situation here. In *Allied,* the court held that the taxpayer was not entitled to capital gain because the transfer of patent rights by the grantor expressly reserved in him the right to grant a non-exclusive license in the same field to another party. Cf. Kavanagh v. Evans, supra, 188 F.2d at 236. Here, however, Bell's grant of an exclusive license to Houde was not subject to any such reservation; Bell reserved no right to grant a non-exclusive license either to itself or anyone else, the MAA agreement being— as pointed out before—a prior limitation upon, not a reserved right to, the invention in question.

 Likewise not negating a sale is the provision in the agreement permitting Bell to manufacture, have manu-

factured, use and sell the anti-shimmy device in the event Houde or its sub-licensees failed to supply the reasonable requirements of Bell and other United States aircraft manufacturers. Considering (1) that the purpose of the amendment was to insure a second source of supply and to protect Bell in the event of a catastrophe or some other unforeseen event which would prevent Houde from meeting Bell's needs, and (2) that as further protection Bell relied not only on Houde's position as a leading national concern of automotive parts and shock absorbers, but also conducted a survey of the financial and manufacturing resources of its licensees, the reserved right of Bell to manufacture for its own use would seem so insubstantial as to be of little tangible value. Monie S. Hudson, 15 TCM 284 (1956); Ruge, 26 T.C. 138 (1956); Puschelberg v. United States, 330 F.2d 56 (6th Cir. 1964). Moreover, this "second source" provision is not different in effect from provisions frequently included in patent agreements which permit termination upon the happening of stated subsequent events beyond the control of the grantor, such as failure by the grantee to meet a minimum production volume or to use its best efforts in marketing the invention. Such provisions have uniformly been held to be consistent with a sale of patent rights. E. g., Watson v. United States, 222 F.2d 689 (10th Cir. 1955); Kronner v. United States, 110 F.Supp. 730, 126 Ct.Cl. 156 (1953); Golconda Corp., 29 T.C. 506 (1957); Dreymann, 11 T.C. 153 (1948). Without significance is the clause in the agreement enabling infringement actions to be brought in Bell's name. This is not the reservation of a proprietary right in

---

5. The holding in *First National Bank of San Diego* also seems inconsistent with the Treasury Regulations under section 1235 of the Internal Revenue Code of 1954 (26 U.S.C. (1958) § 1235), which section deals with capital gains treatment for individuals holding patents as distinguished from corporations, but is otherwise virtually identical to the sections applicable here. Section 1.1235–2(b) of the regulations provides in part: "The term

'all substantial rights to a patent' means all rights * * * which are of value *at the time* the rights to a patent (or an undivided interest therein) are transferred." [Emphasis added.]

6. In passing it will be noted that at the time of the conveyance from Bell to Houde, Bell was not receiving any payments under the limited license, and its future right to payments, if any, rested upon events largely outside its control.

the invention but a procedural matter in no way determinative of whether the grantor has retained any substantial right in the patent. E. g., Merck & Co. v. Smith, 261 F.2d 162, 165 (3d Cir. 1958); Watson v. United States, supra, 222 F.2d at 692; Commissioner v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339, 342 (1944); First National Bank of Princeton v. United States, 136 F.Supp. 818, 822 (D.N.J.1955); Rouverol, 42 T.C. 186, 193 (1964). Moreover, Leubsdorf v. United States, 164 F.Supp. 234, 143 Ct.Cl. 165 (1958), on which defendant relies, does not resemble the present factual situation. In *Leubsdorf,* the taxpayers claimed that certain payments were received under a 1940 contract in return for the sale of patent rights and should be treated as capital gains. The exclusive rights to the patent had been granted to four different parties. The court specifically pointed out that agreements following the alleged 1940 sale of the patent recited on repeated occasions that the plaintiff taxpayers were still "the owners." The court held that the "multiplicity of transactions involving these patents" by the original owners with other parties *after* the original owners had claimed to have sold the patents "negative the idea of such an absolute sale." 164 F.Supp. at 239, 143 Ct.Cl. at 174. Here, on the other hand, Bell at no time entered into a licensing agreement of any kind with respect to the antishimmy device after the agreement with Houde. And changes in the Houde agreement varying the terms of payment and agreed to by both parties are in no way inconsistent with a sale. The fact that parties to a contract later agree on adjustments in the rates to be paid has no relation to the question whether the grantor retained substantial proprietary rights in himself.

In summary, the Houde agreement constituted a sale and not a license and the payments received by Bell pursuant thereto were properly taxable as long-term capital gains rather than ordinary income.

## THE SQUARE D AGREEMENT

Bell and the Square D Company entered into an agreement dated March 1, 1945, whereby Bell granted to Square D an exclusive license to manufacture, use and sell a mach speed indicator covered by a patent application Bell then had pending.[7] The agreement was to be effective for the duration of World War II, plus six months, with an option, which Square D exercised, to renew the agreement for the life of the last expiring patent in the agreement.[8] The Square D agreement was subject, in effect, to the MAA cross-licensing agreement and Bell reserved the right to have manufactured and/or itself manufacture the instrument for its own use in the event Bell's requirements could not be met by Square D. The original agreement did not give Square D the right to sublicense others; however, in August 1951, the parties entered into a supplemental agreement to permit the sublicensing of not more than five other manufacturers of the instrument or for two years, whichever should be shorter, which supplemental agreement was entered into to provide additional procurement sources during the Korean war. The agreement of March 1, 1945 could not be assigned by Square D except with the entire assets and good will of the business to which it related. Bell could cancel the agreement if Square D became involved in legal proceedings relating to its solvency or if it failed to meet the minimum payments or to pay the required royalties. Suit for infringement could be brought in the name of either or both parties,

7. The mach speed indicator is an instrument for showing the speed of aircraft in relation to the speed of sound at air level.

8. The amount received under an option agreement qualifies for capital gains treatment in the year the option is exercised,

provided that the transaction otherwise qualifies for such treatment. After exercise of the option, amounts received under the agreement constitute amounts received from the sale or exchange of a capital asset. Rev.Rul. 57–40, 1957–1 CB 266.

with expenses and recoveries shared equally, or if only one party wished to sue, suit could be brought in that party's own name, with the expenses to be borne by and any recoveries to be retained by that party.

 From these facts, it is concluded that Bell transferred all substantial rights in the mach speed indicator to Square D and that a sale thus resulted. That the original agreement did not transfer to Square D the right to sublicense others is without significance for such a limitation "does not interfere with the full use of the patent by the assignee * * * [and] the assignor retains no use of the patent for himself by reason of the limitation since he has granted the exclusive rights to the assignee * * *." Rollman v. Commissioner, 244 F.2d 634, 640 (4th Cir. 1957), and cases there cited; Parke, Davis & Co., 31 BTA 427, 430 (1934); Crook v. United States, 135 F.Supp. 242, 252 (W.D.Pa.1955). The clause prohibiting the grantee from assigning its interest except in connection with the transfer of the entire assets and good will of the business to which it related was a reasonable method to protect Bell's right to royalty payments, and in no way negatived a sale. Allen v. Werner, 190 F.2d 840, 842 (5th Cir. 1951); Carroll Pressure Roller Corp., 28 T.C. 1288, 1292 (1957). Further, the provisions authorizing cancellation by the grantor Bell upon Square D's involvement in legal proceedings relating to its insolvency or upon its failure to pay royalties or to make the minimum payments required were conditions subsequent which were entirely consistent with a sale.[9]

## THE WEATHERHEAD AGREEMENT

 Bell and the Weatherhead Company entered into an agreement, dated June 15, 1955, granting Weatherhead an exclusive license to manufacture, use and sell under rights to an invention known as a pressure accumulator—a device developed for use in the aero-dynamic control system for the Rascal missile. The agreement was substantially similar to the Square D agreement in that it was subject to the MAA agreement; it contained a second source provision whereby Bell reserved the right to manufacture the device itself in case Weatherhead could not meet its requirements; Bell was authorized to terminate the agreement in the event Weatherhead defaulted as to its minimum payments or became involved in legal proceedings relating to its solvency; Weatherhead could not assign the agreement except with the entire assets and good will of the business to which it related; and infringement suits could be brought in the name of either or both parties. For the reasons previously set out, it is concluded that the Weatherhead agreement was a sale.

## THE WIESNER-RAPP AGREEMENT

Bell and the Wiesner-Rapp Company entered into an agreement dated May 1, 1948, whereby Bell granted to Wiesner-Rapp an exclusive license to manufacture, use and sell a spar milling machine and attachments covered by various patents. The agreement contained a "second source" and other provisions relating to infringement actions, restrictions on assignment, and termination by Bell in the

---

9. Oak Manufacturing Co. v. United States, 301 F.2d 259 (7th Cir. 1962), on which defendant places emphasis, presents a factual situation quite different from that involved here. In that case, Oak was in the electrical switch, vibrator and parts business and granted exclusive foreign rights (with the exception of Canada) to its entire line of products to the grantee, N.S.F. Among other things, the agreement provided that N.S.F. was to occupy the position of an expert sales organization and that it assumed all risks with regard to the customers. On the basis of this provision and the balance of the agreement, together with the facts of the case, the court concluded that the parties contemplated that the grantor was to exercise continuing control over the business established by the transfer of the exclusive license, and that the agreement, therefore, was not for the sale of patent rights, but was an agreement in the nature of a franchise for the distribution of Oak products in new markets and, in reality, represented the establishment of an *agency* relation.

event of Wiesner-Rapp's failure to make minimum payments or its involvement in legal proceedings pertaining to its solvency, which were similar to the provisions in the agreements previously considered.

The spar milling machine had been the subject of an earlier agreement between Bell and the Farnham Manufacturing Company for a term of years which would overlap the Wiesner-Rapp agreement for two years if it continued in existence—and defendant points out there was thus a possibility an outstanding license was in effect for the machines covered by the Wiesner-Rapp agreement. Aside from the fact (as seen before) that a sale is not defeated because an agreement is subject to an existing limited license previously granted, the record shows that after the Farnham agreement was executed, Farnham was absorbed by Wiesner-Rapp. Accordingly, it is apparent that when Wiesner-Rapp entered into the agreement with Bell, it was vested with all rights to the patent without reservation—a conclusion made doubly plain by the fact that the agreement itself was not by its terms subject to any other grant. The Wiesner-Rapp agreement, accordingly, constituted a sale.

## THE SCOVILL AGREEMENT

Bell and the Scovill Manufacturing Company—a company engaged in the business of manufacturing and selling fastening devices—entered into an agreement dated April 1, 1954, whereby Bell granted to Scovill an exclusive license to manufacture and sell under rights to an invention covering a fastening device. The device is used to fasten two pieces of metal together, being used, for example, to fasten an access cover of a hole in the fuselage of a helicopter or to affix a panel over an access opening in electrical equipment.

The agreement contained a second source provision in case Scovill could not meet Bell's requirements; a restriction on assignment; provisions relating to the rights of the parties with respect to infringement actions; and a provision that in the event sales did not equal 300,000 units for any calendar year, the parties agreed to discuss the then current market toward possible revision or modification of the terms of the agreement, except that in the event the parties did not agree to any proposed revision or modification, Bell reserved the right to terminate the agreement on 90 days notice. The right to "use" the invention was not, however, conveyed. Even so, a transaction may still constitute a sale if such failure does not represent the retention of a substantial right by the grantor. Rollman v. Commissioner, 244 F.2d 634 (4th Cir. 1957); Lockhart v. Commissioner, 258 F.2d 343, 349 (3d Cir. 1958); Reid, 26 T.C. 622, 633–34 (1956); cf. Broderick v. Neale, 201 F.2d 621 (10th Cir. 1953).[10] Whether the right retained is substantial depends, of course, upon the circumstances of each case; in the present case it is evident that this right had so little commercial value as to be entirely insubstantial. Scovill was in the business of manufacturing and selling fastening devices— not in the business of manufacturing products which incorporated such devices and, therefore, the rights which had any value were the rights to manufacture and sell the device, not the right

---

10. Pertinent is the following comment in the Senate Finance Committee report dealing with section 1235 of the Internal Revenue Code of 1954 (26 U.S.C. (1958) § 1235): " * * * [T]he courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to 'use' the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones." 3 U.S. Code Cong. & Adm.News (1954) p. 5083.

to incorporate the device into other products. In these circumstances, the rights to manufacture and sell the fastening device "amount to full and complete control, for the omission from the contract of the express right to use the patented article did not in any way limit or restrict * * * [Scovill] in its operations under the patent, or reserve any right of practical value to * * * [Bell]." Rollman v. Commissioner, supra, 244 F.2d at 639. Likewise consistent with a sale is the provision permitting termination if sales did not equal 300,000 units in any calendar year. As seen before, provisions such as this, authorizing cancellation by the grantor if a specified number of the patented units are not sold in a prescribed period, are conditions subsequent which do "no more that provide that upon the occurrence of a stated event the grantor was empowered to terminate the exclusive right and title theretofore conveyed." Watson v. United States, 222 F.2d 689, 691 (10th Cir. 1955). See also e. g., Golconda Corp., 29 T.C. 506, 509 (1957). It is concluded that the Scovill agreement was a sale.

## THE PRIME-MOVER AGREEMENT

■■ On February 20, 1950, Bell entered into an agreement with the Prime-Mover Company to sell its entire mechanized wheelbarrow business, including (i) all of Bell's interest in patents and patent applications identified with that device, and (ii) raw materials, tools, work in process, future orders, planning sheets, production know-how and related instructions for manufacturing the parts and assembling the machines to enable Prime-Mover to produce the mechanical wheelbarrows in a pro-

duction line. The agreement provided, among other things, that as soon as possible after the signing of the agreement Bell (1) would deliver to Prime-Mover the subassemblies and parts, tools, jigs, fixtures, etc. relating to the mechanical wheelbarrow, and (2) would assign to Prime-Mover all its rights and title in and to the patents and patent applications covering the device.[11] It appears from the record, however, that Bell did not actually execute an assignment of the principal wheelbarrow invention—and defendant argues that this prevents the agreement from being a sale.[12] The short answer is that the agreement to assign the invention—without more— vested in Prime-Mover the entire beneficial ownership (i. e., equitable title) in the invention since that agreement carried with it an implied agreement—which was enforceable in the courts—that the assignor Bell would take all steps necessary to vest title therein in the assignee. E. g., 2 Walker on Patents (Deller's ed.) §§ 354, 355; Ridsale Ellis, Patent Assignments and Licenses (2d ed.) § 290.[13] The Prime-Mover agreement, it is concluded, constituted a sale.

## THE AGUSTA MODEL 47–J AGREEMENT

Bell and Agusta[14] entered into an agreement dated November 1, 1956, under which Bell granted to Agusta the exclusive right to manufacture, assemble and sell the Bell Model 47–J helicopter in Italy. The agreement provided for the transfer to Agusta of (i) all the necessary patent rights, and (ii) Bell's production know-how, including engineering and manufacturing data which would enable Agusta to enter the helicopter business and to reproduce and duplicate

11. There is no dispute that the payments involved in this suit were not for repayment of loans or payments for inventory or work in process.

12. Defendant concedes that but for this fact the payments Bell received under the agreement would be periodic payments of the purchase price of the business and taxable as long-term capital gains.

13. By contrast, an agreement to assign a patent *when issued* constitutes an executory contract to assign the invention upon the happening of a later event, i. e., the issuance of the patent, and thus does not constitute a sale at the time of the execution of the agreement. Dreymann, 11 T.C. 153, 161 (1948).

14. Costruzioni Aeronautiche Giovanni Agusta.

the particular model helicopter. The agreement was for the full remaining term of the latest patent coming thereunder; however, Bell could terminate for breach by Agusta of any of the terms and conditions upon 60 days notice and Agusta's failure to cure the breach during that notice period. The agreement also contained a provision allowing either party to terminate it at any time after 10 years, with or without cause, upon 60 days notice, which provision was included for Bell's protection since it had no prior experience with Agusta's financial capacity or technical ability.

The patent rights furnished to Agusta were necessary in order to give it the legal right to manufacture the Model 47–J helicopter. As to the transfer of know-how, Bell had spent over $10,000,-000 in the research, development and manufacture of the world's first commercially licensed helicopter, which helicopter was licensed and certified by the Civil Aeronautics Administration (now the Federal Aviation Authority) in 1946.[15] The subsequent larger and more powerful 47–J helicopter was developed and certified at an additional cost of $3,500,000. By virtue of the agreement with Bell, Agusta received the benefit of the FAA certification and obtained engineering know-how (from this and a prior agreement) which enabled it to build a small replica of the Bell Fort Worth plant and to enter into the helicopter business without the years of research and development and the expenditure of the millions of dollars which Bell had been required to spend in order to develop this over-all helicopter know-how. The know-how and capability to produce helicopters thus furnished to Agusta did not depend upon reference to the patent drawings. An added factor relevant to the agreement is that the "production

life" of a particular Bell model helicopter is limited to eight years or less, though its "operating life" is unlimited. However, even had Bell discontinued a certain model of helicopter, it would take steps to prevent its being manufactured by anyone else without its permission, since a helicopter model is an asset even if Bell is not manufacturing that particular model.

Against this background, it is clear— and the parties agree—that the bundle of rights transferred by this agreement —consisting of patents and engineering information or know-how—constituted a capital asset, the know-how being an incident of the patents and thus taking on their nature as property. Heil Co., 38 T.C. 989, 1001–1002 (1962); Dairy Queen of Oklahoma v. Commissioner, 250 F.2d 503 (10th Cir. 1957); Gowdey's Estate v. Commissioner, 307 F.2d 816 (4th Cir. 1962); Moberg v. Commissioner, 305 F.2d 800 (5th Cir. 1962); Moberg v. Commissioner, 310 F.2d 782 (9th Cir. 1962); United States v. Wernentin, 354 F.2d 757 (8th Cir. 1965); Rev.Rul. 64–56, 1964–1 CB 133.

 While there is thus no question that a capital asset was transferred by the agreement, the provision therein giving either side the right to terminate the agreement, with or without cause, at the end of 10 years necessitates the conclusion that the transaction constituted a licensing arrangement and not a sale. As in the case of realty where a conveyance in perpetuity is needed to constitute a sale, so in the case of a patent (and rights incident thereto) a transfer for the remaining life of the patent is generally a prerequisite for a sale. By this token, a transfer limited in duration to a period less than the remaining life of the patent, or a transfer—as here

---

15. The usefulness and value of the rights to any commercial aircraft, including helicopters, depend upon such FAA certification. Without certification by the government, the commercial aircraft or helicopter cannot be sold to the public or used to transport the public. Such certification is recognized not only in the United States

but also in foreign countries, including Italy and Japan. Before any such certification is granted, the helicopter and each of its major component parts are submitted to an exhaustive series of fatigue and flight tests to determine the serviceability and safety of the craft.

—terminable by the grantor not on the happening of a future event beyond his control but at his own discretion prior to the patent's expiration date will ordinarily constitute a licensing arrangement rather than a sale inasmuch as the transfer does not convey to the transferee all substantial rights in the patent. This is to say that when such power of cancellation exists, the conclusion is usually unavoidable that the grantor retained a substantial interest in the rights which he transferred. See Commissioner v. Sunnen, 333 U.S. 591, 609, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Pickren v. United States, 249 F.Supp. 560, 561 (M.D.Fla. 1965), affirmed by the C.A.5, May 29, 1967; Thomas D. Armour, 22 T.C. 181, 188–89 (1954); Young v. Commissioner, 269 F.2d 89, 92–94 (2d Cir. 1959); Gregg, 18 T.C. 291 (1952), aff'd 203 F.2d 954 (3d Cir. 1953); Treas.Reg. § 1.1235–2(b).

■ In some cases, however, the grantor's reservation of the right to cancel at his own discretion will not preclude a sale where it appears from all the circumstances that the right so reserved has no practical value. Bannister v. United States, 262 F.2d 175 (5th Cir. 1958). See also Young v. Commissioner, supra, 269 F.2d at 92–93.[16] Plaintiff indicates in this connection that Bell's right to terminate at the end of 10 years had no commercial value because (i) the particular model helicopter would become obsolete within eight years; and (ii) once the know-how was transferred to Agusta it was indelibly implanted in its mind and hence could never be taken back. But while the production life of any model helicopter is relatively short, its operating life is virtually unlimited, and even though the production rights for a particular model helicopter have diminished over the years, these rights would still have sufficient value that Bell would take necessary steps to prevent any model

helicopter from being manufactured without its permission, regardless of whether or not production of that model had been discontinued. For (as pointed out) Bell's patents and manufacturing know-how protect its assets, and a helicopter model is an asset even if manufacture of that model has been discontinued; and, indeed, the termination clause was admittedly included for Bell's own protection since Agusta's financial and technical ability to produce helicopters was unknown to it. Moreover, while some of the value of the manufacturing data and know-how would unquestionably be lost through the transfer since Agusta would retain most of the knowledge, yet Bell could sell the data and information to someone else after the 10-year period ended. See Pickren v. United States, supra, 249 F.Supp. at 561.

Plaintiff, in addition, places heavy emphasis on Heil Co., 38 T.C. 989 (1962), acq. 1963–1 CB 4, which, it says, squarely supports its argument that in the situation here presented Bell's right to terminate prior to the expiration date of the patents did not preclude a sale. In *Heil*, the taxpayer entered into an agreement transferring all patents, patent applications and inventions relating to its tractors, its trade name and substantial engineering and manufacturing information for $1 million. The agreement covered 14 basic patents and was for a period of 11 years, but was cancellable by either party at the end of five years, which period was prior to the expiration date of virtually all the patents involved. The Internal Revenue Service, seeking to defeat capital gain treatment for most of the $1 million payment, contended that although the patents transferred may have been capital assets held for more than six months, the engineering and manufacturing know-how was not such an asset, but was, in effect, merely a payment for the performance of per-

---

16. In Magnus v. Commissioner, 259 F.2d 893 (3d Cir. 1958), the agreement provided that either party could terminate after two years by giving three months notice in writing, with the agreement to continue in effect unless such notice was given. The court held that despite this termination provision, the agreement considered as a whole did not actually give the grantor a right to terminate at will.

sonal services. The Tax Court disagreed and stated (p. 1003): "Concededly the patents here involved were long-term capital assets and were sold. The contracts under which they were transferred by way of sale likewise provided for the transfer of the engineering manufacturing information, or know-how, pertinent and necessary to the successful manufacture of products under the patents. In such situation, the information, or know-how, was an incident of the patents, took on the nature of such property, and constituted a long-term capital asset that also was sold." In short, the issue that was litigated in *Heil* was not whether the cancellation provision defeated a sale, but whether the manufacturing information, or know-how, constituted a capital asset. In these circumstances, *Heil* cannot be considered as a persuasive precedent for plaintiff's argument that Bell's reservation of the right to terminate at will prior to the expiration date of the patents did not prevent a sale. Cf. Pickren v. United States, supra. It is concluded rather that the reservation represented the retention by Bell of a substantial interest in the rights transferred to Agusta, which reservation is characteristic of a license and incompatible with a sale.

### THE AGUSTA MODEL 48 AGREEMENT

▪▪▪ Bell and Agusta entered into an agreement dated May 1, 1956, under which Bell granted to Agusta the exclusive right to manufacture and sell the Bell Model 48 helicopter—an experimental model—in Italy. The agreement provided for the transfer to Agusta of (i) all necessary patent rights, and (ii) Bell's production know-how, including engineering and manufacturing data which would enable Bell to reproduce and duplicate a Bell Model 48 helicopter. Pursuant to the agreement, Agusta paid Bell $40,000 for the transfer of this technical information and data. The agreement was for the full remaining term of the latest patent coming thereunder, but

could be terminated by either party for breach of any terms or conditions upon 12 months notice and failure of the other party to cure the breach within that period. But unlike the Agusta Model 47–J agreement, there was no provision in this agreement giving Bell a right to terminate at will.

▪▪▪ For the reasons previously set out, the technical information for which the payment was made constituted a capital asset. Moreover, since the agreement did not contain a provision allowing Bell to terminate at its discretion prior to the expiration date of the patents, it is concluded—and defendant so concedes —that the agreement constituted a sale.

### THE NIPPON MODEL 47–D–1 AGREEMENT

▪▪▪ Bell and Nippon [17] entered into an agreement dated September 19, 1952, under which Bell granted to Nippon the exclusive right to manufacture and assemble the Bell Model 47–D–1 helicopter in Japan. The agreement also gave Nippon sales rights as specified in a supplemental foreign dealer agreement under which Nippon was given the exclusive dealership rights for Bell helicopters in Japan and other countries. The foreign dealer agreement was cancellable by either party upon 90 days notice.

The Nippon agreement provided for the transfer to it of (i) all necessary patent rights, and (ii) Bell's production know-how, including engineering and manufacturing data which would enable Nippon to reproduce and duplicate the Bell Model 47–D–1 helicopter. The Nippon agreement was for the full remaining term of the latest patent coming thereunder, but could be terminated by Bell for breach by Nippon upon six months written notice and Nippon's failure to cure the breach within the notice period. In addition, the agreement could be terminated at the end of 10 years by either party, with or without cause, upon six months written notice, which termination clause was included for Bell's protection since it had no prior experience with

17. Nippon Kikai Boeki Kaisha, Ltd.

Nippon and was not familiar with its technical ability or financial capacity.

In view of this termination provision, which is similar to the provision contained in the Agusta 47–J agreement, it is concluded for the reasons previously discussed that the Nippon agreement constituted a license and not a sale.[18]

18. It is unnecessary because of this conclusion to pass upon defendant's additional contention that the Nippon agreement did not constitute a sale for the stated reason that it did not convey the right to sell the helicopters and the later foreign dealer agreement granting such right could be terminated on 90 days notice.