**BGT ENTERPRISES, INC., et al., Appellants,**

v.

**Donald D. GRONHOLZ, Respondent.**

**No. C1–86–1915.**

Court of Appeals of Minnesota.

May 19, 1987.

Robert J. McGuire, William L. Hickey, Cousineau, McGuire, Shaughnessy & Anderson, Minneapolis, for appellants.

William G. Peterson, Bloomington, for respondent.

Heard, considered and decided by RANDALL, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

RANDALL, Judge.

Plaintiffs BGT Enterprises, Inc., Michael P. Tierney and Charles C. Boisjolie brought an action for specific performance, seeking to compel assignment of a patent from Donald Gronholz to the corporation. Gronholz claimed there was no contractual agreement for assignment, and that he retained all rights in his patent. The trial court ruled in favor of Gronholz. Plaintiffs' motion for a new trial was denied and they appeal from that denial. We affirm.

## FACTS

In late 1974 or early 1975, Donald Gronholz (now deceased) showed Charles Boisjolie his invention, a router guide. Boisjolie contacted Michael Green about the possibility of marketing the invention. At that time Boisjolie and Green signed a confidential disclosure agreement which said that each "recognizes that all rights to the [router guide] are reserved by Donald Gronholz." Michael Green was replaced by Michael Tierney, and Gronholz, Boisjolie and Tierney began meeting to discuss the possibility of marketing the router guide. Gronholz would contribute his invention and Boisjolie and Tierney would supply marketing efforts and the capital ($8,000–10,000) required for tooling the invention. The men discussed potential buyers and decided to approach Sears because Sears had a large portion of the router market. At this point, the group apparently agreed that any profit resulting from marketing the product would be divided evenly.

The oral agreement to proceed with marketing efforts was made in the spring of 1975. In September 1975, the men met with an attorney to form a corporation. The corporation's stated purpose was "general business purposes." The name of the corporation was BGT Enterprises, Inc., coming from the first letters of the last names of the three men. The parties paid the filing fee and elected a Subchapter S plan for tax purposes. The incorporation papers were filed, but no contribution other than the filing fee was ever made to corporate capital, and little else was ever done at the corporate level. There were no written agreements signed by the three shareholders outlining exactly what would be done with Gronholz's patent.

Tierney contacted Sears with regard to the router guide in the summer of 1975. Sears was interested but referred Tierney to the Singer Company, which supplied Sears with power tools and accessories. In February 1976, Tierney took a prototype of the router guide to Singer, which was located in South Carolina. Singer was interested in the guide but wanted to manufacture it themselves, rather than dealing with a BGT manufactured part. Singer was most interested in the possibility of a licensing agreement.

In March 1976, the three men met with an attorney to discuss their business relationship. As a result of the meeting, the attorney drafted a document which provided that Gronholz would assign his patent to the corporation and the corporation would try to sell or license the product until December 31, 1977, and thereafter attempt to produce and distribute it. If the product was not sold, licensed, produced or distributed by December 31, 1978, Gronholz could require the corporation to reassign the product to him. This document was signed only by Tierney and the proposed agreement was never carried out by the parties.

In the meantime, Gronholz engaged a law firm for the purpose of securing a patent on the guide. The application was filed February 4, 1976, and was granted on August 30, 1977. The filing fees, legal fees and expenses, totaling approximately $2,300, were paid by Gronholz. Gronholz did not ask the others to share in this expense.

During this time Tierney continued contact with Singer and Sears. In April 1978 Singer notified Tierney that they were putting negotiations on hold indefinitely. BGT never manufactured the guide because when Sears and Singer ceased to be interested, they felt they had no market.

In the fall of 1981, the parties realized that Sears was selling a router guide remarkably similar to Gronholz's. They discussed a civil suit against Sears. Gronholz informed appellants that they had no rights in the invention and again refused to assign his patent to the corporation. Gronholz eventually brought his own lawsuit against Sears. Tierney and Boisjolie brought this suit to compel assignment of the patent to BGT Enterprises, Inc.

## ISSUES

1. Were the trial court's findings supported by the evidence?

2. Is appellants' action barred by the statute of limitations?

## ANALYSIS

A trial court's findings of fact will be upheld unless clearly erroneous. Minn.R. Civ.P. 52.01; *Larson v. St. Louis County,* 366 N.W.2d 304, 305 (Minn.Ct.App.1985). The evidence must be viewed in the light most favorable to the prevailing party. *Id.*

## I

*Enforceable Contract*

Appellants argue that the actions and writings of the parties make it clear that Gronholz agreed to contribute his patent. It is undisputed that the three men agreed to try and market Gronholz's router guide. Boisjolie was the one who introduced Gronholz and Tierney. His contribution to the enterprise consisted of this introduction plus paying for some of the meals they had during their discussions. Tierney spent some time and effort contacting Sears and Singer to establish a market for the product. His costs involved a trip to Chicago, a trip to South Carolina and perhaps 200 hours of time. Each of these men contributed $40 toward the incorporation fee.

Boisjolie and Tierney were to contribute toward the cost of tooling the invention, which was estimated at approximately $10,000. Boisjolie and Tierney never actually transferred the money. They claim that they would have if it was ever needed, but since there never was an established market, they saw no point in putting up the $10,000 until there were actual buyers.

Gronholz was to contribute his invention and he admits he agreed to this. However, the parties never determined exactly what "contributes" meant. During the initial discussions, it seemed clear that they contemplated producing the router guide and marketing a finished product. However, the difference between an outright assignment by Gronholz to the corporation or a licensing of the patent rights by Gronholz to the corporation was never pinpointed. It was not until Singer and Sears indicated that they were more interested in a licensing agreement than marketing a finished product that Tierney and Boisjolie began pressing Gronholz to assign his patent rights to the corporation. At this point, it was still never made clear how Gronholz was to "contribute" his invention. The appellants assumed and argued that this could only be done by an outright assignment of the patent with all its rights. That is not the case. Gronholz could have contributed his invention by licensing the corporation to manufacture and market the guide.

A patent is an intangible asset. It is usually transferred by an assignment. If there is a transfer of all the substantial rights in a patent, it is considered an assignment * * *. *A transfer of anything less is called a license * * *.*

*Oak Manufacturing Co. v. United States,* 301 F.2d 259, 262 (7th Cir.1962) (emphasis added). The transfer of less than all the substantial rights of a patent is a license which conveys no proprietary interest to the licensee. *Bell Intercontinental Corporation v. United States,* 180 Ct.Cl. 1071, 381 F.2d 1004, 1010 (1967). If the group had ever reached the point where production was feasible, Gronholz could have

made his contribution by license rather than assignment. Thus appellants' argument that assignment was the only "reasonable conclusion" is not sound.

■ There is significant evidence to support the finding that Gronholz never assigned or intended to assign all rights in his patent to the corporation. When Gronholz first met with Boisjolie and Green (Tierney later took Green's place in the efforts) he had them sign a confidential Disclosure Agreement which provided among other things that the disclosee "recognizes that all rights in and to subject items [router circle cutter and edge guide attachment] are reserved by Donald Gronholz." This agreement was never revoked and Gronholz testified it was an oversight on his part not to have Tierney sign a similar agreement when he replaced Green in the venture. This same agreement was to be used by the corporation when the invention was disclosed to potential buyers.

On two occasions, once in March 1976 and again in 1981, Gronholz was specifically asked to assign all his interest in the patent and adamantly refused to do so. It seems clear that he never intended to assign all of the rights in his patent to the company. Gronholz filed the patent application in his own name and paid all of the expenses involved, even though the corporation was already formed.

There is nothing in the Articles of Incorporation which indicates Gronholz agreed to assign his patent. As appellants acknowledge in their brief, there is nothing in writing to show that Gronholz ever agreed to assign his patent to the corporation.

The evidence supports the trial court's ruling that Gronholz never agreed to assign his patent to BGT Enterprises, Inc. We agree with the trial court that there is insufficient evidence to support an enforceable contractual agreement regarding assignment of Gronholz's patent.

## II

### Statute of Limitations

Respondent argues in the alternative that even if there is an enforceable agreement requiring him to assign his patent to the corporation, such action is barred by the relevant statute of limitation. Our affirmance on the first issue of there being no enforceable contract is dispositive. However, because both parties have briefed the statute of limitations question and because it, standing alone, would also be dispositive of the matter, we address it.

Minn.Stat. § 541.05, subd. 1 (1986) provides in part:

Except where the uniform commercial code otherwise prescribes, the following actions shall be commenced within six years:

(1) Upon a contract or other obligation, express or implied, as to which no other limitation is expressly prescribed; * * *.

The respondent asserts that the time begins to run from the time of the alleged agreement, on or about September 23, 1975. Litigation on a claimed contract must begin within six years after a cause of action accrues. The time period begins to run when the breach occurs. "[G]enerally, a cause of action is deemed to have accrued when facts exist which enable one party to maintain an action against another * * *." *Konecny v. United States*, 388 F.2d 59, 65 (8th Cir.1967) (quoting *Great American Insurance Co. v. Louis Lesser Enterprises, Inc.*, 353 F.2d 997, 1001 (8th Cir.1965)).

■ The pleadings allege that the agreement to assign the patent occurred in September of 1975 when the parties incorporated. To apply the statute of limitation the court must determine when a breach of the agreement occurred. There was no testimony as to exactly when Gronholz was supposed to assign his patent. However, as early as March 1976, Gronholz refused to sign the assignment papers prepared by an attorney. This action to enforce the "agreement" began July 21, 1984, about eight years after Gronholz first refused to assign his rights in the patent. Regardless of the date of the alleged breach, September 1975 or March 1976, it is more than six years prior to the commencement of this lawsuit, and thus barred by the applicable statute of limitations.

**325**

## DECISION

The evidence supports the trial court finding that there was no enforceable contract requiring Gronholz to transfer his patent to BGT, Inc. If such a contract ever existed, the breach occurred more than six years prior to the commencement of the action, and thus is barred by the applicable statute of limitations.

Affirmed.